RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0139p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

THOMAS M. COOLEY LAW SCHOOL,

*Plaintiff-Appellant,*

v.

KURZON STRAUSS, LLP; DAVID ANZISKA; JESSE STRAUSS,

*Defendants-Appellees.*

No. 13-2317

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:11-cv-00844—Robert J. Jonker, District Judge.

Argued: April 30, 2014

Decided and Filed: July 2, 2014

Before: DAUGHTREY, McKEAGUE, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael P. Coakley, MILLER CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellant. David Anziska, LAW OFFICES OF DAVID ANZISKA, Brooklyn, New York, for Appellee Anziska. Jesse Strauss, STRAUSS LAW PLLC, New York, New York, for Appellees Kurzon and Strauss. **ON BRIEF:** Michael P. Coakley, Brad H. Sysol, Paul D. Hudson, MILLER CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellant. David Anziska, LAW OFFICES OF DAVID ANZISKA, Brooklyn, New York, for Appellee Anziska. Jesse Strauss, STRAUSS LAW PLLC, New York, New York, for Appellees Kurzon and Strauss.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge.    Plaintiff Thomas M. Cooley Law School claims that defendants Kurzon Strauss, LLP, David Anziska, and Jesse Strauss published defamatory statements regarding plaintiff's institution, causing $17 million in damages.    In granting defendants' motions for summary judgment, the district court held that plaintiff was a limited-purpose public figure and that the record would not allow a reasonable jury to conclude that defendants published the challenged statements with actual malice.    We agree and affirm.

I.

Plaintiff Thomas M. Cooley Law School is a non-profit law school with campuses in Lansing, Ann Arbor, Auburn Hills, and Grand Rapids, Michigan, and Riverview, Florida. Plaintiff is currently the largest law school in the country, enrolling over 3,500 students at its five campuses.

When plaintiff filed suit, defendant Kurzon Strauss, LLP was a New York law firm with two partners, defendant Jesse Strauss and nonparty Jeffrey Kurzon, and one "of counsel" attorney, defendant David Anziska.    A few months later, Kurzon Strauss, LLP changed to Kurzon LLP, and Strauss and Anziska ended their associations with the firm.

On June 8, 2011, under a heading titled "Investigating the Thomas Cooley School of Law," Anziska posted the following statement on the website "JD Underground," hosted at http://www.qfora.com/jdu:

> My firm is currently conducting a broad, wide-ranging investigation of a number
> of law schools for blatantly manipulating their post-graduate employment data
> and salary information.   These schools are preying on the blithe ignorance of
> naive, clueless 22-year-olds who have absolutely no idea what a terrible
> investment obtaining a JD degree is.   Perhaps one of the worst offenders is the
> Thomas Cooley School of Law, which grossly inflates its post-graduate
> employment data and salary information.   More ominously, there are reports that
> there [sic] students are defaulting on loans at an astounding 41 percent, and that
> the school is currently being investigated by the DOE for failing to adequately

disclose its students' true default rates.  Unfortunately, the ABA has proven to be absolutely toothless in regulating these schools and stamping out these dubious practices, and most likely schools like Thomas Cooley will continue to defraud unwitting students unless held civilly accountable.  If you have any relevant information or know of anyone who has attended Thomas Cooley feel free to contact me at anziska@kurzonstrauss.com.  Obviously, all correspondences will be kept strictly confidential.

On June 13, 2011, defendants received a cease-and-desist letter from plaintiff claiming that the JD Underground post was false and defamatory.  Also on June 13, Anziska spoke on the phone with plaintiff's general counsel about the matter.  As a result of these communications, on June 15, 2011, under a heading titled "Retraction re: Investigating the Thomas Cooley School of Law," Strauss posted the following statement on JD Underground:

> It has been brought to this firm's attention that a post on this site on June 8, 2011 entitled, "Investigating the Thomas Cooley School of Law" contained certain allegations which may have been couched as fact regarding employment and default data.  These statements are hereby retracted.  Moreover, representatives of Thomas Cooley Law School have informed us that published reports regarding Thomas Cooley Law School's student loan default rate and of an investigation by the Federal Department of Education are incorrect.  Therefore, we retract those statements as well.
>
> Kurzon Strauss LLP

Sometime between June 17, 2011, and July 13, 2011, Anziska sent a draft proposed class action complaint to twenty individuals, eighteen of whom were either former or current students of plaintiff law school.  The complaint stated, among other things, that plaintiff "blatantly misrepresent[s] and manipulat[es] its employment statistics to prospective students, employing the type of 'Enron-style' accounting techniques that would leave most for-profit companies facing the long barrel of a government indictment and the prospect of paying a substantial criminal fine"; and that plaintiff "grossly inflates its graduates' reported mean salaries[.]" Anziska instructed these individuals to forward the draft complaint to "anyone who may be interested[.]"  As a result, the complaint was forwarded to an additional twenty people, and, ultimately, it became publicly available on the internet.[1]

---

[1] Defendants later filed a proposed class action against plaintiff on behalf of several graduates of plaintiff's institution, alleging that plaintiff deceived, defrauded, and misled the proposed class regarding post-graduation employment prospects.  The district court dismissed the complaint for failure to state a claim under Rule 12(b)(6),

On July 14, 2011, plaintiff filed suit against defendants, alleging state-law claims of defamation, tortious interference with business relations, breach of contract, and false light. The district court granted summary judgment in favor of defendants; plaintiff timely appealed.

## II.

### A.

We review de novo the district court's grant of summary judgment. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Burley v. Gagacki*, 729 F.3d 610, 618 (6th Cir. 2013).

### B.

To provide the appropriate context for plaintiff's arguments, we first identify the alleged defamatory statements. Plaintiff alleges that the following statements from defendants' JD Underground post were defamatory:

> Cooley "grossly inflates its post-graduate employment and salary information"[;]

> "[T]here are reports that there [sic] students are defaulting on loans at an astounding 41 percent rate, and that the school is currently being investigated by the DOE for failing to adequately disclose its students' true default rates[;]"

> "[M]ost likely schools like Thomas Cooley will continue to defraud unwitting students unless held civilly accountable."

Plaintiff also alleges that the following statements made in defendants' draft proposed class action complaint were defamatory:

> Cooley "blatantly misrepresent[s] and manipulat[es] its employment statistics to prospective students, employing the type of 'Enron-style' accounting techniques that would leave most for-profit companies facing the long barrel of a government indictment and the prospect of paying a substantial criminal fine[;]"

> Cooley "grossly inflates its graduates' reported mean salaries[.]"

---

and we subsequently affirmed. *See MacDonald v. Thomas M. Cooley Law Sch.*, 880 F. Supp. 2d 785 (W.D. Mich. 2012), aff'd, 724 F.3d 654 (6th Cir. 2013).

With these statements in mind, we next turn to the applicable law.

C.

The elements of a defamation claim under Michigan law are: (1) a false and defamatory statement about the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005).

Regarding the third element—the fault standard—if the plaintiff is a "public figure," the plaintiff must also establish that the defendant published the defamatory statement "'with "actual malice,"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Herbert v. Lando*, 441 U.S. 153, 156 (1979) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). The actual malice standard arose from the Supreme Court's recognition that the First Amendment limits the extent to which speech may be chilled by tort liability. *See Sullivan*, 376 U.S. at 279–80. A plaintiff must show actual malice by clear and convincing evidence and whether a record may support a finding of actual malice is a question of law. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).

There are two kinds of "public figure" plaintiffs: a "limited-purpose" public figure and a "general-purpose" public figure. *See Bufalino v. Detroit Magazine, Inc.*, 449 N.W.2d 410, 416 (Mich. 1989) (Levin, J., concurring). A limited-purpose public figure is a public figure with respect to "a limited range of issues," and one achieves that status by "voluntarily inject[ing] himself . . . into a particular public controversy." *Gertz*, 418 U.S. at 351. A general-purpose public figure is one who attains "such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id.*

D.

The district court held that plaintiff is a limited-purpose public figure regarding the public controversy over "the value of a law degree" and that it has failed to offer proof from which a reasonable jury could find actual malice by clear and convincing evidence. Plaintiff advances a

variety of challenges to these holdings. First—leading with an issue never presented below—plaintiff argues that it need not show actual malice because defendants' defamatory statements were unprotected commercial speech. Second, plaintiff claims that it was not required to show actual malice because it is not a limited-purpose public figure. Third, even if a showing of actual malice is required, plaintiff insists its proofs are sufficient to submit to the jury. Fourth, plaintiff maintains that the district court erred in its alternative holding that a number of defendants' statements were nonactionable "exaggeration" or "hyperbole." And fifth, plaintiff requests summary judgment under Rule 56(f) for defendants' statements regarding student loan default rates and the alleged DOE investigation. We begin our analysis with plaintiff's first argument.

1.

The parties dispute whether we should consider plaintiff's commercial-speech issue, which Cooley admits is presented for the first time on appeal. Simply stated, plaintiff argues that the actual malice standard does not apply because defendants' statements are defamatory commercial speech.[2] Defendants argue that plaintiff is precluded from raising this novel issue because Cooley failed to raise the issue below, despite extensive briefing on whether the challenged statements enjoyed heightened First Amendment protection. Citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), and *Yee v. City of Escondido*, 503 U.S. 519 (1992), for the "traditional rule [] that once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below[,]" *Lebron*, 513 U.S. at 379, plaintiff responds that because it preserved the "claim" that defendants' speech does not enjoy heightened First Amendment protection, it may make any argument in support of that "claim" on appeal.

We have recently summarized the law of issue preservation in our circuit as follows:

This court requires timely and reasoned presentation of non-jurisdictional issues to avoid forfeiture. It is well-settled that this court's function is to review the case presented to the district court, rather than a better case fashioned after an

---

[2]Plaintiff's argument arises from precedent in the Third, Fifth, and Ninth Circuits holding that defamatory commercial speech is not subject to the heightened protections of the actual-malice standard. *See Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001); *Procter & Gamble v. Amway Corp.*, 242 F.3d 539, 547–48 (5th Cir. 2001); *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 937 (3d Cir. 1990).

unfavorable order. Arguments not squarely presented to the district court are not reviewed on appeal.

*Dice Corp. v. Bold Technologies*, 556 F. App'x 378, 384 (6th Cir. 2014) (internal quotation marks and citations omitted). Our forfeiture rule "is justified by two main policy goals. First, the rule eases appellate review by having the district court first consider the issue. Second, the rule ensures fairness to litigants by preventing surprise issues from appearing on appeal." *Rice v. Jefferson Pilot Fin. Ins. Co.*, 578 F.3d 450, 454 (6th Cir. 2009) (internal quotation marks and citations omitted).

We decline to address Cooley's commercial-speech issue. Plaintiff admits that it did not raise this issue below, which is one of first impression in our circuit. This court will exercise its discretion to entertain issues not raised before the district court "[o]nly in exceptional cases" or when application of the rule would produce a "plain miscarriage of justice[.]" *Id.* (internal quotation marks and citation omitted); *see also Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, 669 F.3d 737, 753 (6th Cir. 2012) ("Generally, a reviewing court should not consider issues in the first instance when they were not litigated in the trial court except in exceptional circumstances."). Plaintiff does not sufficiently explain why it failed to raise the commercial-speech issue before the district court, nor does it articulate why we should exercise our discretion to grant an exception to our forfeiture rule. Moreover, the commercial speech theory was not pled in plaintiff's complaint nor developed through discovery. Consequently, defendants had no notice that plaintiff would advance this issue for the first time on appeal.

Plaintiff's reliance on *Lebron* and *Yee* is misplaced. As we have already recognized, those cases "address the prudential limitations applicable to the Supreme Court's certiorari jurisdiction[,]" *Kentucky Sch. Boards Ins. Trust v. Horace Mann Ins. Co.*, 188 F.3d 507, 1999 WL 685929, *3 (6th Cir. Aug. 27, 1999) (unpublished table decision), and do not alter our well-settled rule that "this court declines to entertain arguments not presented in the first instance to the district court[,]" *Taft Broad. Co. v. United States*, 929 F.2d 240, 243–44 (6th Cir. 1991) (internal quotation marks and citation omitted). Accordingly, this is not an "exceptional case" for which we will reach plaintiff's unpreserved commercial speech issue, nor will a "miscarriage of justice" result from us not addressing this forfeited issue. *Rice*, 578 F.3d at 454.

2.

Next, the parties dispute whether plaintiff is a limited-purpose public figure. Plaintiff argues that the "public controversy" regarding the "value of a law degree" was unrelated to the subjects of defendants' statements. Specifically, because the statements concerned (1) whether plaintiff's graduates were defaulting on their loans at a rate of 41 percent and whether the Department of Education ("DOE") was investigating plaintiff for failing to disclose actual default rates; and (2) whether plaintiff "grossly inflates" and was "blatantly manipulating" its postgraduate employment and salary data, only a "public controversy" related to those subjects could possibly be relevant. But at the time defendants published their statements, there was no "public controversy" on those matters. Therefore, plaintiff asserts that because defendants cannot show that the alleged defamatory remarks specifically related to a particular public controversy, Cooley is a private figure.

Defendants respond by arguing that plaintiff's "public controversy" definition is too narrow and should not be limited to plaintiff-specific post-graduate employment data or loan repayment data. Rather, the operative public debate, which predates defendants' statements, concerns whether law schools—in general—are reporting accurate post-graduate employment data and whether law school graduates—in general—can obtain meaningful legal employment in order to pay back large student loans, which are backed by the U.S. Treasury. Defendants maintain that plaintiff is a limited-purpose public figure in this "public controversy" because it has repeatedly and voluntarily introduced its opinions into the public debate.

We have recognized that "*Gertz* establishes a two-pronged analysis to determine if a plaintiff is a [limited-purpose] public figure." *Clark v. ABC, Inc.*, 684 F.2d 1208, 1218 (6th Cir. 1982) (citing *Gertz*, 418 U.S. at 345, 352). "First, a 'public controversy' must exist." *Id.* "Second, the nature and extent of the individual's involvement in the controversy must be ascertained[,]" *id.*, so that the court can determine whether the plaintiff voluntarily injected itself into the particular public controversy giving rise to the alleged defamation, *Gertz*, 418 U.S. at 345, 351.

In analyzing whether a "public controversy" exists, we are mindful that "all controversies of interest to the public" are not "public controversies" within the meaning of *Gertz. See Clark*,

684 F.2d at 1218. Rather, a "public controversy" is "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Pub., Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980). It is "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Id.*; *accord Lundell Mfg. Co., Inc. v. ABC, Inc.*, 98 F.3d 351, 363 (8th Cir. 1998); *Partington v. Bugliosi*, 56 F.3d 1147, 1159 n.18 (9th Cir. 1995); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1554 (4th Cir. 1994). Most importantly, "the court must isolate the specific public controversy related to the defamatory remarks." *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1137 (10th Cir. 2006).

In the second stage, we determine the nature and extent of a plaintiff's participation in a public controversy by considering three factors: "first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy." *Clark*, 684 F.2d at 1218 (citing *Gertz*, 418 U.S. at 344–45, and *Wolston v. Reader's Digest Assoc., Inc.*, 433 U.S. 157, 165–68 (1979)).

Starting with the first prong of the analysis, defendants have the better argument. The record shows two public debates: (1) whether law schools are reporting accurate post-graduate employment data, and (2) whether law school graduates can afford to pay back student loans. Regarding the former, publications such as the New York Times (January 2011), U.S. News & World Report (March 2011), The New Republic (April 2011), and Ohio Lawyer (November/December 2010) published articles on this issue *before* defendants posted the alleged defamatory statements in June 2011. Furthermore, two California Bar Presidents and a U.S. Senator criticized the American Bar Association—before defendants published—for its inaction on the employment data issue. That the published articles did not specifically name plaintiff does not mean a "public controversy" over law school graduate employment data did not exist. Most importantly, plaintiff expressly recognized that a "public dialogue about the national legal employment picture" has existed "since the onset of the recession[.]"

The above cited articles also address a "public controversy" over law school graduates' ability to repay student loans given the difficulty of securing meaningful legal employment. In

further support, defendants have shown the existence of numerous "law school scam" blogs which were dedicated to publicly exposing the financial crisis for recent law school graduates. The record also contains an article, which predates the alleged defamatory statements, claiming that only 36 percent of plaintiff's graduates were actively repaying their loans, and both Anziska and Strauss have testified to reading a post on the website "All Education Matters," hosted at http://alleducationmatters.blogspot.com, which quoted an anonymous whistleblower, who stated that plaintiff's recent graduates were defaulting at a rate of 41 percent. Moreover, that same website also contained two posts, both from April 2011, claiming that the DOE was investigating plaintiff for "Serious Title IV Violations." On this record, defendants have shown the existence of a "public controversy" regarding whether law schools were reporting accurate post-graduate employment data and whether law school graduates can afford to pay back student loans.[3]

Regarding the second prong of the analysis, defendants have demonstrated that plaintiff voluntarily injected itself into the public debate. First, Cooley undeniably entered the public debate on this topic by: (1) publicly responding to the question "whether law schools in [Michigan] are churning out too many grads"; (2) publicly responding to reports of a Department of Education investigation; and (3) by producing its own "report" to expressly rebut the narrative of "bloggers" and "a small element within the media" that attending law school could be financially ruinous:

> The purpose of Report One is to insert the nation's most authoritative employment data into the public dialogue about the national legal employment picture. Since the onset of the recession and during the slow recovery, this public dialogue has been dominated by bloggers and a small element within the media. According to their posts and stories, lawyers are largely unemployed, law school graduates have no hope for employment, and the investment in law school is not worthwhile. They assert that attending law school is a bad decision because of the lack of jobs, given the cost of legal education. Most of these assertions are anecdotal, unbalanced, lacking in factual support, and as Report One reveals, contrary to official U.S. employment data.

Second, plaintiff has access to channels of effective communication to express its position, including its website, advertisements, recruiting materials, written publications, and career

---

[3]Although our characterization of the operative "public controversy" differs from the one identified by the district court, i.e., "the value of a law degree," our description is simply a more accurate definition of the broader public debate that the district court recognized.

services presentations, and plaintiff has utilized those channels to disseminate its message that the critics do not have their facts straight. Third, plaintiff plays a prominent role in the debate: it has the largest enrollment of any accredited law school and has been actively participating in the public discourse. Under these circumstances, we have no trouble concluding that plaintiff has "thrust itself into the vortex" of the operative public controversies. *Ogle v. Hocker*, 279 F. App'x 391, 399 (6th Cir. 2008). Accordingly, because plaintiff is properly classified as a limited-purpose public figure, the court need not address defendants' alternative argument that plaintiff is a general-purpose public figure.[4]

3.

We next address the question of whether the record contains clear and convincing evidence from which a reasonable jury could conclude that defendants published the challenged statements with actual malice. The "actual malice" fault standard is a subjective one in which the ultimate question is whether the defendant made the statement with "knowledge that the statement was false" or with "reckless disregard for the truth." *Harte-Hanks*, 491 U.S. at 667. To make a statement with reckless disregard for the truth, a defendant must have made the statement "with a high degree of awareness of probable falsity," or must have "entertained serious doubts as to the truth of his publication[.]" *Id.* at 667 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964) and *St. Amant v. Thompson*, 390 U.S. 727, 730 (1969)).

A plaintiff must establish actual malice with clear and convincing evidence. "[T]he clear and convincing evidence standard, the most demanding standard applied in civil cases," is evidence that:

> produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

*In re Martin*, 538 N.W.2d 399, 410 (Mich. 1995) (internal brackets, citations, and quotation marks omitted).

---

[4]The district court likewise did not reach the question of whether plaintiff is a general-purpose public figure.

"The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks*, 491 U.S. at 685. "This rule is not simply premised on common-law tradition, but on the unique character of the interest protected by the actual malice standard[:] our profound national commitment to the free exchange of ideas[.]" *Id.* at 685–86. "Most fundamentally, the rule is premised on the recognition that judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice." *Id.* at 686 (internal brackets, citation, and quotation marks omitted). The proofs in this record do not cross that threshold.

Starting with the statements regarding employment data published in the JD Underground post and in the draft proposed class action complaint, defendants testified that beginning in mid-2011, they undertook an investigation into whether law schools accurately reported post-graduate employment data, which included reading numerous articles and papers about the issue; visiting at least fifteen "law school scam" blogs and other websites dedicated to exposing the employment crisis facing recent law school graduates; speaking with a law professor at a major state school, as well as two "law school scam" bloggers, about their personal knowledge on this issue; and communicating with numerous law school graduates interested in serving as named plaintiffs for contemplated class action lawsuits against plaintiff and other law schools. Believing that certain law schools—including plaintiff—were misrepresenting employment data and graduate salaries, defendants actually filed a proposed class action complaint against plaintiff, an action that was—as the district court recognized—"inconsistent with a subjective belief that the statements were false or likely false."

Plaintiff responds that a reasonable jury could find that defendants published with actual malice because Anziska allegedly admitted that he did not know whether their statements were true or not, plaintiff twice told defendants on June 13, 2011, that the statements were false, and defendants admitted the falsity of the statements because they retracted the JD Underground post on June 15, 2011, but then subsequently published those same statements in the draft proposed class action complaint. Plaintiff also labels defendants' investigation into employment data as

"shoddy," claiming that it represented an "extreme departure from the standards of investigation[.]" *Id.* at 668.

The evidence does not create a genuine issue of material fact on whether defendants published the challenged statements with actual malice. First, Anziska's statement that he "didn't know"—which plaintiff's general counsel recorded in his contemporaneous notes during the June 13, 2011, phone call with Anziska—referred only to Anziska's personal knowledge of any DOE investigation and did not relate to statements in the draft proposed class action complaint. Second, that plaintiff informed defendants of its belief that the employment and salary data statement in the JD Underground post was false does not show that *defendants* subjectively believed their statement to be false or made with reckless disregard for the truth; it shows only that *plaintiff* believed defendants' statements were false. Third, Strauss retracted the employment data statement in the JD Underground post only to the extent it was couched as fact. In other words, defendants have steadily held the opinion that plaintiff misrepresents employment statistics and salaries,[5] which is corroborated by their conduct in actually filing a proposed class action against plaintiff. Fourth, plaintiff's critique of defendants' investigation offers no basis for a jury to conclude that they acted with actual malice, and there is nothing in the record to suggest that defendants purposely avoided the truth. *Id.* at 692 (although a defendant's failure to investigate, without more, does not establish a reckless disregard of the truth, the "purposeful avoidance of the truth" may be sufficient to establish actual malice). Indeed, the objective truth regarding employment data was far from certain, and the record amply shows that defendants were investigating to *uncover* the truth regarding law school graduate employment data, not purposefully avoid that truth, whatever it may have been. *See Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 528 (6th Cir. 2007) ("[Defendant's] investigatory efforts, even if less than those of a reasonably prudent person, belie any argument that [it] purposely avoided the truth."). And fifth, to the extent these issues are "close calls," plaintiff's evidence is not "so clear, direct[,] weighty and convincing as to

---

[5]"Courts that have considered the matter have concluded that Internet message boards and similar communication platforms are generally regarded as containing statements of pure opinion rather than statements or implications of actual, provable fact." *Ghanam v. Does*, 845 N.W.2d 128, 144 (Mich. Ct. App. 2014).

enable the factfinder to come to a clear conviction, without hesitancy[,]" that defendants published the employment data statements with actual malice. *In re Martin*, 538 N.W.2d at 410.

Similarly, the record does not permit a reasonable jury to find that defendants published their statements concerning a DOE investigation and plaintiff's graduates' default rates with actual malice. Defendants testified that they published these statements based on three posts from the All Education Matters website: two of which, concerning the alleged DOE investigation, are in the record, one of which, concerning the default rates, is not. Regarding the missing post, defendants explain that they have "been unable to obtain the relevant post off the All Education Matters website, which is most likely due to the fact that it got lost when the website switched to a new webhost." Defendants also based their default rate statement on an article, which claimed that only 36 percent of plaintiff's graduates were actively repaying their loans.

Plaintiff responds that a reasonable jury could find that defendants published with actual malice because there is no proof of any post on All Education Matters discussing default rates; there is no proof of any other "report" claiming that plaintiff's graduates have a 41 percent default rate or that the DOE was investigating plaintiff; plaintiff is entitled to the reasonable inference that defendants knew their DOE investigation statement was false because before defendants published the JD Underground statement in June 2011, they read a post on All Education Matters, dated April 28, 2011, in which plaintiff's general counsel stated that the rumors of a DOE investigation were false; and defendants' reliance on "crazy blog post[s]" shows "obvious reasons" to doubt the truthfulness of the original speaker and his purposeful avoidance of the truth about default rates and the alleged DOE investigation.

Cooley's response does not demonstrate that a reasonable jury could find by clear and convincing evidence that defendants published with actual malice. First, as discussed above, plaintiff's attack on the scope and depth of defendants' investigation is not persuasive because "[w]hether a statement was made with reckless disregard for the truth is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the defendant in fact entertained serious doubts as to the truth of its publication." *Milligan v. United States*, 670 F.3d 686, 698 (6th Cir. 2012) (internal citation and

quotation marks omitted). Therefore, plaintiff's suggestions on how defendants should have conducted their investigation provide no foundation for a jury to conclude that defendants subjectively contemplated "serious doubts" about the truth of the statements. *See Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 412 (6th Cir. 1991) (holding that the defendants were not "liable for failing to perform the thorough professional investigation [the plaintiff] would have preferred"). Second, plaintiff's criticisms are relevant to the extent that they accuse defendants of purposely avoiding the truth, but there is no evidence that they did. *See Compuware*, 499 F.3d at 528 ("The relevant legal inquiry focuses on the extent of the defendant's efforts to avoid the truth, not the extent of the defendant's investigation to discover the truth."). Third, even if we grant plaintiff the inference that defendants read the April 2011 post from plaintiff's general counsel, that inference only shows that defendants understood that *plaintiff* had no knowledge of any DOE investigation; nowhere in the post does plaintiff state that the DOE is not, in fact, conducting an investigation, a critical distinction. Fourth, defendants' JD Underground post indicates simply that there had been "reports" of a DOE investigation, not that the DOE had actually been investigating plaintiff, again, a critical distinction. The same goes for the "reports" about default rates. *See Street v. National Broadcasting Co.*, 645 F.2d 1227, 1236–37 (6th Cir. 1981) ("When the truth is uncertain and seems undiscoverable through further investigation, reliance on [other] sources is not unreasonable."). Fifth, even if we assume that the contents of these "reports" were objectively false, it does not follow that defendants republished the reports with knowledge of that falsity because "[t]here is a 'significant difference between proof of actual malice and mere proof of falsity,'" and Anziska testified that he believed the reports were true at the time he made the JD Underground statement. *Jolliff v. N.L.R.B.*, 513 F.3d 600, 615 (6th Cir. 2008) (quoting *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984)). And sixth, considering the absence of any evidence that defendants subjectively doubted the truth of the challenged statements, the clear and convincing evidentiary standard compels the conclusion that plaintiff cannot present its legally deficient proofs to a jury.

The First Amendment tolerates a public-figure plaintiff recovering damages in a defamation case only if the plaintiff has shown that the defendant published defamatory statements with actual malice. The evidence in this record is insufficient to cross that

constitutional threshold. Therefore, we affirm the district court's holdings that Cooley is a limited-purpose public figure and that no reasonable jury could find that defendants published the challenged statements with actual malice.

4.

Because the record could not support a finding of actual malice, we need not address the district court's alternative holding that certain statements of defendants were "exaggeration or hyperbole" or "substantially true." Relatedly, without proof of actual malice, plaintiff is not entitled to summary judgment on the DOE investigation and default rate statements. Furthermore, we need not address the remaining state-law claims of tortious interference with business relations, breach of contract and false light because they fail along with the defamation claim, and nor do we offer any opinion on whether plaintiff could hold defendants Kurzon Strauss, LLP, and Strauss liable if its claims went forward.

III.

Finally, we address an issue unrelated to the merits. At the end of Strauss's response brief, he argues that he is entitled to appellate sanctions for a variety of reasons. However, as plaintiff correctly notes, Rule 38 of the Federal Rules of Appellate Procedure requires a request for sanctions to be made by a "separately filed motion," Fed. R. App. P. 38; "[a] statement inserted in a party's brief that the party moves for sanctions is not sufficient[.]" *Simmons v. Allstate Life Ins. Co.*, 65 F.3d 526, 531 (6th Cir. 1995) (quoting the Advisory Committee Notes to Rule 38). Accordingly, we decline to consider Strauss's procedurally improper request for sanctions.

IV.

For these reasons, we affirm the judgment of the district court.