RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ZACHARY BAISDEN and BRENDA L. SISSOKO,

                *Plaintiffs-Appellants*,

    *v.*

CREDIT ADJUSTMENTS, INC.,

                *Defendant-Appellee*.

> No. 15-3411

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:13-cv-00992—Edmund A. Sargus, Jr., Chief District Judge.

Argued:  December 9, 2015

Decided and Filed:  February 12, 2016

Before:  BATCHELDER and GRIFFIN, Circuit Judges; and CARR, District Judge.[*]

---

## COUNSEL

**ARGUED:**   Daniel R. Freytag, FREYTAG CARPENTER LLC, Columbus, Ohio, for Appellants.  Brian M. Spiess, MONTGOMERY, RENNIE & JONSON, Cincinnati, Ohio, for Appellee.  **ON BRIEF:**  Daniel R. Freytag, Kendra L. Carpenter, FREYTAG CARPENTER LLC, Columbus, Ohio, for Appellants.  Brian M. Spiess, George D. Jonson, MONTGOMERY, RENNIE & JONSON, Cincinnati, Ohio, for Appellee.

---

[*]The Honorable James G. Carr, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.　This putative class action arises out of Credit Adjustments, Inc.'s attempts to collect a little over one thousand dollars of medical debt incurred by Zachary Baisden and Brenda Sissoko ("plaintiffs").　Plaintiffs contend Credit Adjustments violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii), when it placed debt collection calls to their cell phone numbers using an "automatic telephone dialing system" and an "artificial or prerecorded voice."　Credit Adjustments neither disputes that it placed calls to their cell phone numbers nor that it used the technologies as alleged.　Rather, Credit Adjustments contends that by virtue of plaintiffs' provision of their cell phone numbers to the hospital where they received medical care, plaintiffs gave their "prior express consent" to receive such calls and, thus, it did not violate the TCPA as interpreted by the Federal Communications Commission ("FCC").　The district court entered summary judgment for Credit Adjustments on this basis, and we affirm.

I.

Plaintiffs received medical care from Mount Carmel Hospital in Columbus, Ohio. Consultant Anesthesiologists provided anesthesiology services to each at Mount Carmel Hospital, billing Baisden $850.00 in 2011, and Sissoko $273.42 in 2009 and $171.52 in 2011. After plaintiffs did not pay these bills, Consultant Anesthesiologists transferred these delinquent accounts to Credit Adjustments.　Credit Adjustments called plaintiffs' cell phone numbers, despite never having received their contact information directly from them.　Instead, Credit Adjustments received the numbers from Consultant Anesthesiologists, which received them from Mount Carmel Hospital.

As part of their admission for services to Mount Carmel Hospital, Baisden and Sissoko signed Patient Consent and Authorization forms covering "all medical and surgical care." Baisden's authorization provides, in pertinent part, as follows:

2.  Release of information

*I understand Mount Carmel may use my health information for many reasons as needed*:

- insurance information

 - *billing and payment*

- discharge planning and other health care providers

- quality improvement reviews

- Medicare, Medicaid, and other government programs

- Bureau of Workers' Compensation

- my employer if I am injured on the job

- medical and nursing education programs

- public health reporting

- legal, regulatory, and accreditation agencies

*Mount Carmel may receive or release my health information, whether written, verbal, fax, or electronic using secured internet web sites.*

**The above also allows Mount Carmel to release medical information about drug and/or alcohol abuse, HIV (Human Immunodeficiency Virus) testing or HIV infection related conditions. This authorization shall remain valid for one (1) year.**

3.  Acknowledgement of notice of privacy practices

I have received or been offered a copy of Mount Carmel's Notice of Privacy Policies. I have had a chance to object to the use or release of my information to the hospital directory or to my family or persons involved in my care.

(Emphasis in italics added.) Sissoko signed two different forms. In 2011, she agreed to the same terms set forth for Baisden. The 2009 form, however, is different and provides in pertinent part as follows:

2. Release of information

*I understand Mount Carmel may use my health information for a range of purposes including* insurance/payment eligibility verification; *billing and*

*collecting moneys due from me,* private and public payors or their agents including insurance companies, managed care entities, my employer, state and federal government programs and the Bureau of Workers' Compensation; obtaining pre-admission or continued length of stay certification; quality of care assessment and improvement activities; evaluating the performance or qualifications of physicians and health care workers; conducting medical and nursing training and education programs; conducting or arranging for medical review and audit services; ensuring compliance with legal, regulatory and accreditation requirements, performance of autopsies, and; public health activities. *I authorize Mt. Carmel to receive or release my health information, whether written, verbal, electronic including secured internet web sites or by facsimile to such employees, agents or third parties as are necessary for these purposes and to companies who provide billing services for physicians or other providers involved in my medical care.*

I understand that complete, accurate health information must be readily available for my medical care. Therefore, I authorize Mount Carmel to release health information to my family physician, referring physician or agency(ies) in order to facilitate continuity of care. I understand that the information shared with health care professionals as a result of this authorization will remain confidential.

The preceding authorizations for release of medical information include authorization for the release of information regarding drug and/or alcohol abuse, HIV (Human Immunodeficiency Virus) testing or HIV infection related conditions. This authorization shall remain valid for one (1) year.

3. Acknowledgement of notice of privacy practices

I acknowledge that I have received or been offered a copy of Mount Carmel's Notice of Privacy Practices and have had a chance to object to the use or discharge of my information for directory, disaster relief or to provide information to family or persons involved in my care.

(Emphasis added.)

Plaintiffs allege Credit Adjustments violated the TCPA by using an "automatic telephone dialing system" and an "artificial or prerecorded voice" to place calls to their cell phone numbers because they had not given their numbers to Credit Adjustments, or the creditor on whose behalf it was calling, Consultant Anesthesiologists. The district court granted summary judgment in favor of Credit Adjustments, reasoning that plaintiffs had given their "prior express consent" by way of providing their contact information to Mount Carmel Hospital and therefore were precluded from bringing claims under the TCPA. Plaintiffs timely appeal.

II.

A.

The TCPA regulates the use of certain technology when placing calls to consumers.[1]  It makes it unlawful for any person to place a call "using any automatic telephone dialing system or an artificial or prerecorded voice" to a cell phone number without obtaining the "prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A)(iii).  "[T]he FCC has interpretive authority over the [TCPA]," *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 467 (6th Cir. 2010), and its "rulings . . . shape the law in this area[.]"  *Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 551 (6th Cir. 2015).  Because this is not a direct agency appeal challenging the validity of the FCC's interpretations, we lack jurisdiction to consider whether the FCC's interpretations regarding "prior express consent" are consistent with the TCPA.[2]  *See Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 637 (6th Cir. 2015) ("[T]he Hobbs Act confers jurisdiction on Courts of Appeal to review FCC regulations only by direct appeal from the FCC.").  Accordingly, this case turns *only* on whether the district court properly granted summary judgment on the basis that Credit Adjustments had "prior express consent" to call plaintiffs' cell phone numbers, which we review de novo.  *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014).

B.

The FCC has provided extensive guidance regarding what constitutes "prior express consent," and four of its interpretations are particularly pertinent.  First, in 1992, the FCC interpreted "prior express consent" to include a form of implied consent, reasoning in a Report and Order that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."  *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8769 (1992) (footnote omitted) (the "*1992 Order*").  In support of this

---

[1]In this regard, it is distinct from those consumer laws regulating the *content* of such calls, such as the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*

[2]We note the FCC's broad interpretations regarding "prior express consent" are not without their critics. *See, e.g., Hill*, 799 F.3d at 553–54 (Clay, J., concurring).

construction, the FCC relied upon the TCPA's legislative history, "noting that in such instances, 'the called party has in essence requested the contact by providing the caller with the telephone number for use in normal business communications.'" *Id.* at 8769 n.57 (citation omitted). The FCC was careful to distinguish between these permissible contacts where a party "call[s] a number which was provided as one at which the called party wishes to be reached" and impermissible contacts where a party learns of a telephone number in another way, such as by capturing a telephone number via Caller ID. *Id.* at 8769. The essence of this distinction is that in contrast to the former, the latter involves a situation where "the caller cannot be considered to have given an invitation or permission[.]" *Id.* *See also Hill*, 799 F.3d at 551 ("[A] party who gives an 'invitation or permission to be called at [a certain] number' has given its express consent with respect to that number.") (alteration in original) (citing the *1992 Order*).

Second, the FCC extended this general proposition in 2008 to cell phone numbers: "autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 559 (2008) (footnote omitted) (the "*2008 Ruling*"). It gave the following insight on how this manifests:

> We conclude that the provision of a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt. . . . We emphasize that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed.

*Id.* at 564–65 (footnote omitted). The *2008 Ruling* also "conclude[d] that the creditor should be responsible for demonstrating that the consumer provided prior express consent." *Id.* at 565. That is, "[s]hould a question arise as to whether express consent was provided, the burden will be on the creditor to show it obtained the necessary prior express consent." *Id.* Finally, the *2008 Ruling* holds that calls placed by a debt collector (like Credit Adjustments) on behalf of a creditor (like Consultant Anesthesiologists) "are treated as if the creditor itself placed the call." *Id.* (footnote omitted).

Third, in its 2014 *GroupMe* Declaratory Ruling, the FCC held "that the TCPA does not prohibit a caller . . . from obtaining the consumer's prior express consent through an intermediary[.]" *Matter of GroupMe, Inc./Skype Commc'ns S.A.R.L Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 29 FCC Rcd. 3442, 3444 (2014) ("*GroupMe*"). Extending the logic of the *1992 Order* and the *2008 Ruling* to intermediaries, the FCC noted the TCPA's ambiguity as to how consent need be obtained: "While the TCPA plainly requires a caller to obtain such consent, both the text of the TCPA and its legislative history are silent on the method, including by whom, that must be done." *Id.* (footnote omitted). But the FCC emphasized that "prior express consent" is not so narrow as to only require consent between the parties:

> Although the [*2008 Ruling*] did not formally address the legal question of whether consent can be obtained and conveyed via an intermediary, . . . [it] did make clear that consent to be called at a number in conjunction with a transaction extends to a wide range of calls "regarding" that transaction, even in at least some cases where the calls were made by a third party.

*Id.* at 3446. Thus, consent may be obtained by and conveyed through an intermediary. *Id.* at 3444–47.

Fourth and finally, the FCC affirmed its *GroupMe* decision on July 10, 2015. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015) ("*2015 Order*"). The FCC again stressed that there is no one way to provide consent: "[N]either the Commission's rules nor its orders require any specific method by which a caller must obtain such prior express consent . . . [and] the scope of consent must be determined upon the facts of each situation[.]" *Id.* at 7990 (footnotes omitted). In reiterating that callers may "obtain[] a consumer's prior express consent through an intermediary[,]" the FCC stated that "[i]mportantly, . . . an intermediary can only convey consent that has actually been obtained, and cannot provide consent on behalf of another party." *Id.* at 7990–91 (footnote omitted). Put differently, the context of the consent provided is critical. *See Hill*, 799 F.3d at 552; *compare, e.g., Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1308 (11th Cir. 2015) (plaintiff gave prior express consent when he provided his cell phone number when asked for his contact information before donating blood), *with Nigro v. Mercantile Adjustment Bureau,*

*LLC*, 769 F.3d 804, 806–07 (2d Cir. 2014) (plaintiff did not give prior express consent when he gave his cell phone number to a power company to discontinue his mother-in-law's service after her death, and thus not in the context of a transaction resulting in a debt).

III.

Baisden and Sissoko contend the FCC's rulings do not apply where, as here, a consumer provides his cell phone number to one entity during the course of a business relationship, which then provides that number to a related entity, which then provides that number to a debt collector to call on its behalf. Plaintiffs focus on the *2008 Ruling*'s statement that "prior express consent is deemed to be granted only if the wireless number was provided *by the consumer to the creditor.*" *2008 Ruling*, 23 FCC Rcd. at 564 (emphasis added). The essence of their argument is that in order for the FCC's rulings to apply, plaintiffs needed to provide their cell phone numbers to their creditor, Consultant Anesthesiologists, which they did not do. We reject this narrow reading of the FCC's interpretations.

We recently (and "[u]nsurprisingly") held in *Hill* that "a person gives his 'prior express consent' under the [TCPA] if he gives a company his number before it calls him." 799 F.3d at 552. There, we emphasized that the context in which a debtor provides his cell phone number matters: the concept of "prior express consent" "ensures that a debtor who gives his number *outside* the context of the debt has not given his consent to be called regarding the debt." *Id.* Importantly, we noted that while debtors "typically give their cellphone number as part of a credit application at the beginning of the debtor-creditor relations, it doesn't *have* to be that way." *Id.* (alterations and internal citations omitted). As but one example, we approvingly cited *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014), an Eleventh Circuit decision that the district court in this case found dispositive. Indeed, *Mais* is directly on point, indistinguishable from the present facts, and persuasive regarding how we should apply the FCC's "prior express consent" interpretations.

In *Mais*, the plaintiff sought emergency medical treatment from a hospital. *Id.* at 1113. As part of the admissions process, the plaintiff's wife provided the hospital with the plaintiff's cell phone number. *Id.* The admissions forms, signed by the plaintiff's wife, contained a variety

of disclosures regarding what the hospital may do with the plaintiff's "health information," including disclosing the information to its "business associates" (i.e., its independent physicians) and for the purpose of "bill[ing] and collect[ing] payment." *Id.* at 1114. After the plaintiff failed to pay for radiology services provided by a physician's group to plaintiff while at the hospital, the group transferred his account information—including his cell phone number, which it received from the hospital—to a debt collection company. *Id.* The debt collection company used automated technology to place calls to plaintiff's cell phone number, and the plaintiff brought a purported class action under the TCPA. *Id.*

The Eleventh Circuit rejected the same argument plaintiffs present here: that the *2008 Ruling* applies only to situations where a consumer provides a cell phone number "*to the creditor . . .* during the transaction that resulted in the debt owed." *Id.* at 1122–23 (citing the *2008 Ruling*). This "narrow reading," reasoned the Eleventh Circuit, "would find prior express consent when a debtor personally delivered a form with his cell phone number to a creditor in connection with a debt, but not when the debtor filled out a nearly identical form that authorized another party to give the number to the creditor." *Id.* at 1123. Moreover, our sister circuit relied on the fact that the FCC has held that "prior express consent" exists when one has "made the number *available* to the creditor regarding the debt"; *i.e.*, not just in "direct delivery" cases. *Id.* (quoting the *2008 Ruling*) (emphasis added). The *Mais* court bolstered this conclusion by noting the FCC's recognition in *GroupMe* "that the TCPA does not prohibit a caller from obtaining consent through an intermediary," and its reliance on the *2008 Ruling* and *1992 Order* for the proposition that "consent to be called at a number in conjunction with a transaction extends to a wide range of calls 'regarding' that transaction, even in at least some cases where the calls were made by a third party." *Id.* (citing *GroupMe*). Accordingly, "the appropriate analysis turns on whether the called party granted permission or authorization, not on whether the creditor received the number directly." *Id.*

Baisden and Sissoko argue *Mais* is "seriously flawed" because, they contend, it enlarges the scope of the FCC's rulings in four key ways. First, they claim *Mais* construed the phrase "provide" too broadly to mean something more than just "directly giving a cellular telephone number to a creditor" and thus read out its consumer protection construction, especially in light

of criticism that the rule is "manifestly contrary to the statute and unreasonable." We find this contention to be meritless because it would require us to both opine on the validity of the FCC's rulings (which we cannot do) and ignore the FCC's use of the word "available," as well as its clear directive that there is no one way for a party to provide consent.

Second, plaintiffs argue that "prior express consent" is an exception and thus must be strictly construed. This may be true, but to follow this logic, we must reject the FCC's guidance—which again, we cannot do in this procedural posture.

Third, plaintiffs contend that none of the FCC's rulings relied upon by the Eleventh Circuit support its conclusion. Notably, according to plaintiffs, the *Mais* court misread *GroupMe* to apply to the provision of *cell phone numbers* by an intermediary as opposed to "prior express consent." They also contend that *GroupMe*'s holding that "the TCPA does not prohibit a caller . . . from obtaining the consumer's prior express consent through an intermediary" is narrow because the service at issue there both *obtained* "prior express consent" from consumers and then *represented* that "prior express consent" to others, and note that there is no record evidence that Mount Carmel Hospital both *obtained* "prior express consent" and then *represented* to Consultant Anesthesiologists that it had done so. We disagree. *GroupMe* stressed that "allowing consent to be obtained and conveyed via intermediaries *in this context* facilitates . . . *normal, expected, and desired business communications* in a manner that preserves the intended protections of the TCPA." 29 FCC Rcd. at 3445 (emphasis added). The *2015 Order* also emphasized that consent depends "upon the facts of each situation." 30 FCC Rcd. at 7990. Similarly, if one provides a cell phone number to a health organization seeking medical treatment, and a provider affiliated with that health organization treats that person for the same ailment, it is normal, expected, and desired to interpret that provision of the cell phone number as an invitation for an entity affiliated with that organization to call for something *arising out of* one's treatment.

Fourth, Baisden and Sissoko argue that *Mais* undermines the rationale of the "prior express consent" exception. That is, the rule codifies social practice: if one gives a number (especially when requested), it is an invitation to be called. From this, they contend there is no social practice to extend the giving of a number to be an invitation for a third party to call. This

argument, again, asks us to opine on the validity of the FCC's interpretations. And, for the reasons already stated, one could argue that there *is* a social practice applicable to the facts at issue here.

In sum, we find *Mais* persuasive and adopt its conclusion that consumers may give "prior express consent" under the FCC's interpretations of the TCPA when they provide a cell phone number to one entity as part of a commercial transaction, which then provides the number to another related entity from which the consumer incurs a debt that is part and parcel of the reason they gave the number in the first place. More specifically, the provision of a cell phone number to a hospital that then provides that cell phone number to an affiliated physicians' group that provided medical services to a consumer arising out of the same occurrence can constitute "prior express consent" under the TCPA. The FCC's rulings in this area make no distinction between directly providing one's cell phone number to a creditor and taking steps to *make that number available* through other methods, like consenting to disclose that number to other entities for certain purposes. And, the FCC's *GroupMe* ruling and *2015 Order* make clear that there is no one way for a caller to obtain consent, and that such consent can be conveyed by another party. The district court did not err in concluding the FCC's interpretations applied to this matter.

IV.

We now turn to whether "the facts of [this] situation" dictate a finding that plaintiffs provided their "prior express consent" as part of their admissions to Mount Carmel Hospital. At the outset, we agree with plaintiffs that the district court did not distinguish between the different authorizations signed by plaintiffs. It attributed certain portions of the authorizations to each, ignoring that the authorization signed by Sissoko in 2009 differs in many respects from the one signed by both Sissoko and Baisden in 2011. The better approach, therefore, is to separately examine the authorizations.

Sissoko's 2009 Authorization

The Sissoko 2009 authorization and the authorization at issue in *Mais* are virtually indistinguishable. In *Mais*, the plaintiff acknowledged that the hospital "may use and disclose health information about your treatment and services to bill and collect payment from you[.]"

768 F.3d at 1124. Sissoko similarly represented that "Mt. Carmel may use [her] health information for a range of purposes including . . . billing and collecting money's due from [her.]" The *Mais* plaintiff understood that the hospital could "use and disclose health information . . . [t]o business associates we have contracted with to perform the agreed upon service and billing for it," "disclose your health information to our business associates so that they can perform the job we've asked them to do and bill you," and "release the healthcare information for purposes of . . . payment . . . ." *Id.* (alterations in original). Likewise, Sissoko authorized Mount Carmel Hospital to "release [her] health information . . . to such employees, agents or third parties as are necessary for these purposes and to companies who provide billing services for physicians or other providers involved in [her] medical care." It could not be clearer, therefore, as to what Sissoko permitted Mount Carmel Hospital to do with her "health information"—Mount Carmel Hospital could give it to Consultant Anesthesiologists for the purposes of debt collection, and Consultant Anesthesiologists could give the same to Credit Adjustments. *See id*. at 1122 ("A patient filling out a form from a healthcare provider may very well expect to be contacted about his health and treatment. But if the form explicitly states that the provided information will be used for payment and billing, the patient has the same reason to expect collection calls as a retail consumer.").

The question then becomes whether "health information" includes Sissoko's cell phone number. Relying on *Mais*, the district court answered in the affirmative:

> The [*Mais*] court explained that "[t]he cell phone number listed by Mais's wife on the Hospital admission form was part of the record from his visit and was contact information related to billing." Further, the court relied upon the statutory definitions found in the Health Insurance Portability and Accountability Act ("HIPAA"), which support its interpretation. HIPAA defines "health information" to include "any information . . . created or received by a health care provider" that "relates to . . . the past, present, or future payment for the provision of health care to an individual." As did the *Mais* court, this Court finds that the hospital's registration forms, in which it received Plaintiffs' wireless numbers, constitute information related to future payment, and therefore, part of Plaintiffs' health information.

(Internal citations omitted.) Plaintiffs contend this was in error because: (1) the authorization in *Mais* expressly defined "health information," and Sissoko's 2009 authorization does not;

(2) HIPAA and its definition of "health information" do not apply to consumers; (3) the general public would not understand the ordinary meaning of "health information" to include a cell phone number; and (4) the adhesive nature of the authorization must be construed in plaintiffs' favor.

While these arguments carry some weight, the result would be nonsensical. That is, their reading would make the express provision authorizing disclosure of Sissoko's information as "necessary for . . . purposes" of "billing and collecting moneys due from [her]" inoperative if Mount Carmel Hospital could not release the very contact information—including her cell phone number—she provided to the hospital as part of her admission. Moreover, the district court properly relied upon HIPAA to bolster its conclusion. Though Sissoko did not draft the 2009 authorization (and thus it should be construed in her favor), the authorization is a contract related to giving consent for medical care, and, as such, "health information" must be read through this prism to give it a proper meaning. *See Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 764 (6th Cir. 2008) ("[C]ommon words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument.") (applying Ohio contract law and alteration in original). Under HIPAA, "health information" includes "any information . . . created or received by a health care provider . . . relat[ing] to . . . the past, present, or future payment for the provision of health care to an individual." 42 U.S.C. § 1320d(4). Contact information most undoubtedly is any information that relates to a patient's payment for care provided.

Sissoko next claims that the 2009 authorization was only valid for one year—beginning August 3, 2009—and thus did not authorize any calls to her made after one year. The FCC has opined that "consumers may revoke consent through any reasonable means," *2015 Order*, 30 FCC Rcd. at 7993, and the 2009 authorization's one-year sunset provision might so qualify. But we need not consider this issue because the provision relied upon by Sissoko for this one-year limit does not apply as she suggests. After setting forth all of the specific "authorizations," the 2009 authorization then carves out a specific authorization for the release of a certain kind of information:

> The preceding authorizations for release of medical information include authorization for the release of information regarding drug and/or alcohol abuse, HIV (Human Immunodeficiency Virus) testing or HIV infection related conditions. This authorization shall remain valid for one (1) year.

A plain reading of this language indicates that the one-year restriction is not for the *entire* 2009 authorization, but rather for the authorization relating to release of information for drugs, alcohol, and HIV. The "authorization" is set forth in a separate paragraph and distinguishes between "the preceding authorizations" (plural)—i.e., those relating to "billing and collecting moneys due from [her]"—and the authorization (singular) relating to drugs, alcohol, and HIV.

In sum, the district court correctly granted summary judgment to Credit Adjustments for those calls it placed to Sissoko arising out of her 2009 authorization.

Baisden's and Sissoko's 2011 Authorizations

The 2011 authorization similarly cannot be read in the manner suggested by plaintiffs. Like the *Mais* and 2009 authorizations, the 2011 authorization similarly put plaintiffs on notice that Mount Carmel Hospital "may use [their] health information for many reasons as needed . . . [including for] billing and payment." It also provides that "Mount Carmel may receive or release [their] health information . . . ." This authorization is broader in two key respects: (1) it allows Mount Carmel Hospital to use plaintiffs' health information "for many reasons *as needed*" as opposed to the 2009 authorization's "for a range of purposes"; and (2) unlike the 2009 authorization, the 2011 authorization is not limited to the "release [of their] health information . . . to such employees, agents or third parties as are necessary for these purposes and to companies who provide billing services for physicians or other providers involved in my medical care."

Plaintiffs' arguments to the contrary are without merit. First, and as with Sissoko's 2009 authorization, "health information" necessarily includes plaintiffs' contact information; otherwise, the provision concerning "billing and payment" would be rendered meaningless. Second, the above HIPAA discussion also applies. Third, plaintiffs' contentions that the 2011 authorization's "may use" phrase cannot be read as "may disclose," and that the authorization does not specifically identify the entities to which Mount Carmel Hospital would

disclose, wholly ignore the *broad* and *separate* provision authorizing the "release" of plaintiffs' health information. Accordingly, the district court correctly granted summary judgment to Credit Adjustments for those calls it placed to plaintiffs arising out of the 2011 authorization.

In sum, the authorities discussed above make clear that the context in which Baisden and Sissoko provided their cell phone numbers is essential to determining whether they provided "prior express consent" to receive calls to those numbers. They sought medical treatment from Mount Carmel Hospital, and in the course of this relationship, both gave Mount Carmel Hospital their cell phone numbers *and* authorized it to disclose their cell phone numbers to others. The "other" in this case—Consultant Anesthesiologists—has a significant relationship to Mount Carmel Hospital, plaintiffs, and most critically, the debts owed by plaintiffs that arose from the transactions in which plaintiffs provided their cell phone numbers. This case, therefore, fits comfortably within the "prior express consent" limits set forth by the FCC.

## V.

Finally, we reject plaintiffs' reliance on the *2008 Ruling*'s statement that the number must be "provided during the transaction that resulted in the debt owed" for the proposition that Credit Adjustments "failed to prove that the numbers were provided during the anesthesiology services transactions that resulted in the anesthesiology services debts owed." *Hill* addressed this exact argument, as the plaintiff there argued that "during the transaction that resulted in the debt owed" was to be read as only applying to "the '*initial transaction*' that creates the debt." *Hill*, 799 F.3d at 551. We concluded this reading was too constricted:

> Unlike Hill, the FCC never uses the words *initial* or *original* before "transaction." It instead says that the debtor has given his consent when he gives his number "*during the transaction* " that involves the debt (*i.e.,* "regarding the debt"). This language does not change the general definition of express consent; it instead "emphasize[s]" that creditors can call debtors only "to recover payment for obligations owed," not on any topic whatsoever. So it ensures that a debtor who gives his number *outside* the context of the debt has not given his consent to be called regarding the debt. Still, then, any "autodialed and prerecorded message calls to wireless numbers *provided by the called party in connection with an existing debt* are made with the 'prior express consent' of the called party."

*Id.* at 551–52 (internal citations omitted). Indeed, as but one example as to why such a narrow interpretation of "during the transaction that resulted in the debt owed" is inconsistent with the FCC's guidance, we expressly pointed to the exact situation presented here: *Mais*. *Id.* at 552. This disposes of Baisden's and Sissoko's final issue on appeal.

VI.

For these reasons, we affirm the judgment of the district court.