[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14008
_____

D.C. Docket No. 0:11-cv-61936-RNS


MARK S. MAIS,
on behalf of himself and all others similarly situated,

Plaintiff - Appellee,

versus

GULF COAST COLLECTION BUREAU, INC.,

Defendant - Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 29, 2014)

Before HULL, MARCUS and HILL, Circuit Judges.

MARCUS, Circuit Judge:

Plaintiff Mark Mais filed a claim in federal district court against a hospital-based radiology provider and its debt collection agent for making autodialed or prerecorded calls in violation of the Telephone Consumer Protection Act of 1991 (TCPA), Pub. L. No. 102-243, 105 Stat. 2394 (codified at 47 U.S.C. § 227). Defendant Gulf Coast Collection Bureau, Inc. ("Gulf Coast") argued that the calls fell within a statutory exception for "prior express consent," as interpreted in a 2008 declaratory ruling from the Federal Communications Commission (the "FCC" or "Commission"). See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (2008 FCC Ruling), 23 FCC Rcd. 559, 564. The district court granted Mais partial summary judgment against Gulf Coast for alternative reasons: the FCC's interpretation was inconsistent with the language of the TCPA and, regardless, the 2008 FCC Ruling did not apply on the facts of this case.

As we see it, the district court lacked the power to consider in any way the validity of the 2008 FCC Ruling and also erred in concluding that the FCC's interpretation did not control the disposition of the case. In the Hobbs Act, 28 U.S.C. § 2342, Congress unambiguously deprived the federal district courts of jurisdiction to invalidate FCC orders by giving exclusive power of review to the courts of appeals. See Self v. Bellsouth Mobility, Inc., 700 F.3d 453, 461 (11th Cir. 2012). And Mais's claim falls squarely within the scope of the FCC order,

2

which covers medical debts.  The 2008 FCC Ruling "conclude[d] that the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent to be contacted at that number regarding the debt."  23 FCC Rcd. at 564.  There is no dispute that Mais's wife listed his cell phone number on a hospital admissions form and agreed to the hospital's privacy practices, which allowed the hospital to release his health information for billing to the creditor.  As a result, the TCPA exception for prior express consent -- as interpreted in the 2008 FCC Ruling -- entitles Gulf Coast to judgment as a matter of law.  Accordingly, we reverse the district court's grant of partial summary judgment to Mais and remand with instructions to enter final summary judgment for Gulf Coast.

## I.

### A.

The district court found the following facts to be material and undisputed, and indeed the parties have not disputed any of them on appeal.  See Mais v. Gulf Coast Collection Bureau, Inc., 944 F. Supp. 2d 1226, 1230-31 & n.1 (S.D. Fla. 2013).  Mark Mais sought emergency room treatment at the Westside Regional Hospital (the "Hospital") in Broward County, Florida, in 2009.  On behalf of her ill husband, Laura Mais completed and signed admissions documents, which she gave to a Hospital representative.  She provided the admitting nurse with demographic

3

and insurance information, including her husband's cell phone number.  By signing

a Conditions of Admission form, she acknowledged receiving the Hospital's

Notice of Privacy Practices (the "Notice") and expressly agreed that "the hospital

and the physicians or other health professionals involved in the inpatient or

outpatient care [may] release [Plaintiff's] healthcare information for purposes of

treatment, payment or healthcare operations," including "to any person or entity

liable for payment on the patient's behalf in order to verify coverage or payment

questions, or for any other purpose related to benefit payment."  Id. at 1230-31

(alterations in original).  Moreover, the Notice said the Hospital "may use and

disclose health information about [Plaintiff's] treatment and services to bill and

collect payment from [Plaintiff], [his] insurance company or a third party payor."

Id. at 1231 (alterations in original).  The Notice stated that "[w]e may also use and

disclose health information . . . to business associates we have contracted with to

perform agreed upon service and billing for it," including "physician services in

the emergency department and radiology."  In addition, the Notice told patients

that the Hospital "may disclose your health information to our business associate[s]

so that they can perform the job we've asked them to do and bill you."  Finally, the

Conditions of Admission form stated that services provided by "[h]ospital-based

physicians," including "Radiologists," "are rendered by independent contractors"

and "will be billed for separately by each physician's billing company."

4

Mark Mais was admitted to the Hospital, where he received radiology services from Florida United Radiology, L.C. ("Florida United"), a hospital-based provider.  Mais incurred a medical debt of $49.03 to Florida United.  McKesson Practice Services ("McKesson"),  a billing company serving as Florida United's agent, electronically retrieved Mais's telephone number and demographic information from the Hospital and billed Mais.  When Mais did not pay or dispute the debt, McKesson forwarded his account to Gulf Coast for collection pursuant to a written agreement between Gulf Coast and Florida United's parent company, Sheridan Acquisition, P.A. ("Sheridan"), that provided Gulf Coast would "perform third party collection services on referred accounts receivable."  Gulf Coast is a debt collector that uses a predictive dialer to dial telephone numbers through automated technology.  See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14,014, 14,022 (2003) ("Predictive dialers, which initiate phone calls while telemarketers are talking to other consumers, frequently abandon calls before a telemarketer is free to take the next call.  Using predictive dialers allows telemarketers to devote more time to selling products and services rather than dialing phone numbers, but the practice inconveniences and aggravates consumers who are hung up on." (footnote omitted)); id. at 14,093 ("[T]he Commission finds that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing

5

equipment' and the intent of Congress."). Gulf Coast called Mais's cell phone about the debt with its predictive dialer between fifteen and thirty times and left four messages. Gulf Coast similarly placed calls to other putative class members to collect medical debts owed to Florida United.

Mais filed an amended class action complaint against Gulf Coast, Florida United, and Sheridan (collectively, "Defendants") in the United States District Court for the Southern District of Florida, alleging that their collection activities violated the Telephone Consumer Protection Act because Gulf Coast, acting on behalf of Florida United and Sheridan, called Mais's cell phone using an automatic telephone dialing system or a prerecorded or artificial voice without his prior express consent.[1] Before the district court considered the question of class certification, the Defendants moved for summary judgment on the affirmative defense that the calls could not and did not violate the TCPA because Mais provided "prior express consent" to receive them when his wife completed in writing the Hospital admissions forms. See 47 U.S.C. § 227(b)(1)(A)(iii). The Defendants relied on a 2008 FCC Ruling, which concluded that "the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably

---

[1] Mais's amended complaint also named as a defendant Jack W. Brown, III, vice president and part owner of Gulf Coast. The district court separately granted Brown summary judgment because it found Mais pled no substantive cause against him individually and because it saw no evidence that Brown committed, directly participated in, or otherwise authorized the commission of wrongful acts. No appeal has been taken from that summary judgment order, and thus any claims leveled against Brown are not part of this appeal.

evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." 23 FCC Rcd. at 564. Defendants further argued that, because the Hospital had consent to use and disclose Mais's cell phone number under the Health Insurance Portability and Accountability Act (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (1996), the TCPA prior express consent exception was satisfied. Florida United and Sheridan also separately argued that they could not be held vicariously liable for Gulf Coast's calls because § 227(b)(1)(A) of the TCPA only reaches those who "make any call" to a cell phone using automatic dialing or a recorded voice. Mais likewise moved for partial summary judgment, arguing that he had not given prior express consent for the calls because the 2008 FCC Ruling did not apply to medical debt and because his cell phone number had been given to the Hospital, not the creditor, Florida United.

The district court found that Mais, not the Defendants, was entitled to summary judgment on the prior express consent defense mounted by Gulf Coast, Florida United, and Sheridan. The court began by explaining that satisfaction of HIPAA did not automatically ensure compliance with the TCPA, "a separate statute that imposes separate requirements." Mais, 944 F. Supp. 2d at 1234. The district court also determined that Defendants could not prevail on the basis of the 2008 FCC Ruling. While acknowledging that the Hobbs Act gave the federal courts of appeals exclusive jurisdiction to review final FCC orders, the district

7

court determined that it had jurisdiction to examine the FCC's interpretation of the TCPA because the central purpose of Mais's suit was to obtain damages for violations of the statute, not to collaterally attack or invalidate the 2008 FCC Ruling. The court concluded that the Federal Communication Commission's interpretation of "prior express consent" embodied in its 2008 rule was not entitled to any deference because it conflicted with the clear meaning of the TCPA. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."). According to the district court, implying consent from the provision of a cell phone number to a creditor impermissibly expanded the statutory exception to cover "prior express or implied consent." Mais, 944 F. Supp. 2d at 1239. Compare Black's Law Dictionary 346 (9th ed. 2004) (defining "express consent" as "[c]onsent that is clearly and unmistakably stated"), with id. (defining "implied consent" as "[c]onsent inferred from one's conduct rather than from one's direct expression"). Cut loose from any FCC rulemaking concerning the meaning of prior express consent, and thus interpreting the language found in the Act afresh, the district court concluded that listing Mais's cell phone number on the Hospital admissions documents alone did not evince prior express consent to receive autodialed or prerecorded calls. In the alternative, the district court also ruled that,

8

even if the FCC's interpretation of the meaning of prior express consent found in the 2008 FCC Ruling was valid and binding, the rule would not apply under the facts of this case because it was designed to cover consumer and commercial contexts and did not reach medical settings. Moreover, the district court determined, the FCC's 2008 rulemaking would not apply here because Mais's wife gave his number only to the Hospital and not to the creditor, Florida United.

At the same time, the district court ruled that defendants Sheridan and Florida United were entitled to summary judgment anyway because they could not be held vicariously liable under the Telephone Consumer Protection Act for Gulf Coast's calls. Ultimately, the district court granted summary judgment to Mais against Gulf Coast in part, ruling that he was entitled to $500 per call in statutory damages for each of fifteen violative calls placed to his cell phone, as well as an injunction ordering Gulf Coast not to place any further calls to Mais's cell phone in violation of the TCPA. The court left for trial the singular issue of whether Gulf Coast willfully or knowingly violated the TCPA, and thus whether Mais would be entitled to up to treble damages.

After unsuccessfully seeking reconsideration of the summary judgment order, Gulf Coast asked the district court to certify the prior express consent issue for interlocutory appeal because the "order involve[d] a controlling question of law as to which there is substantial ground for difference of opinion" and because "an

9

immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).[2] The district court certified four questions to this Court:

> 1) Whether a district court has jurisdiction under the Hobbs Act to review an FCC order in a TCPA case when the plaintiff does not challenge the validity of that order;
>
> 2) If the district court has such jurisdiction, whether the FCC's pronouncements on the issues of "prior express consent" and vicarious liability are entitled to deference under Chevron;
>
> 3) If the district court lacks such jurisdiction, whether the FCC's opinion on "prior express consent" is limited to the consumer credit transaction arena such that it does not apply to the medical care setting; and
>
> 4) Whether a medical provider's consent to use and disclose patient information, including phone numbers, under HIPAA equates to "prior express consent" for affiliates and agents of that provider to call the patient on his cell phone for debt collection purposes using an automated telephone dialing system.

This Court granted Gulf Coast's timely petition for permission to appeal under § 1292(b).

---

[2] In full, § 1292(b) provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

Though the certified questions may guide our analysis, "[t]he scope of review on appeal under 28 U.S.C. § 1292(b) 'is not limited to the precise question certified by the district court because the district court's order, not the certified question, is brought before the court.'" Moorman v. UnumProvident Corp., 464 F.3d 1260, 1272 (11th Cir. 2006) (quoting Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm., 40 F.3d 1202, 1207 (11th Cir. 1994)); accord Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 205 (1996) ("[T]he appellate court may address any issue fairly included within the certified order because 'it is the order that is appealable, and not the controlling question identified by the district court.'" (quoting 9 James W. Moore & Bernard J. Ward, Moore's Federal Practice ¶ 110.25[1], at 300 (2d ed. 1995))).

## B.

A review of the statutory and regulatory background is critical to understanding the proper resolution of the issues raised by this appeal. In response to evidence "that automated or prerecorded calls are a nuisance and an invasion of privacy," Congress passed the Telephone Consumer Protection Act to balance "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade." TCPA §2(9), (13), 105 Stat. at 2394, 2395. The TCPA prohibits "any person . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any

11

automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1) (emphasis added). The TCPA also creates a private right of action that allows a person to seek an injunction or monetary damages based on a violation of § 227(b) or a regulation promulgated thereunder. Id. § 227(b)(3). For each violation, a plaintiff can recover the greater of actual monetary loss or $500. Id. § 227(b)(3)(B). Up to treble damages are available if the defendant committed a violation willfully or knowingly. Id. § 227(b)(3)(C).

Moreover, Congress has conferred upon the FCC general authority to make rules and regulations necessary to carry out the provisions of the TCPA. Id. § 227(b)(2) ("The Commission shall prescribe regulations to implement the requirements of this subsection."); see id. § 201(b) ("The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter."); id. § 303 ("Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall -- . . . (r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter . . . ."). The TCPA emphasizes that "the [FCC] should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or

12

invasion of privacy." Pub. L. No. 102-243, § 2(13), 105 Stat. at 2395. As a result, the TCPA permits the FCC to create exemptions "by rule or order" for certain automatically dialed or prerecorded calls, such as calls not made for a commercial purpose, 47 U.S.C. § 227(b)(2)(B)(i), calls that will not adversely affect privacy rights and do not involve unsolicited advertisement, id. § 227(b)(2)(B)(ii), and calls made to cell phones that are not charged to the called party, id. § 227(b)(2)(C).

The first FCC rules implementing the Act came in a 1992 Report and Order that concluded "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (1992 FCC Order), 7 FCC Rcd. 8752, 8769. Therefore, the FCC explained, "telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached." Id. In reaching that conclusion, the FCC specifically referenced the House Report on the TCPA, which recognized that, if a person knowingly releases his phone number, calls are permitted because "the called party has in essence requested the contact by providing the caller with their telephone number for use in normal business communications." Id. at 8769 n.57 (quoting H.R. Rep. No. 102-317, at 13 (1991)).

13

In 2008, in response to a Petition for Expedited Clarification and Declaratory Ruling filed by ACA International, a trade organization of credit and collection companies,[3] the FCC after notice and comment issued a Declaratory Ruling "clarify[ing] that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party."  2008 FCC Ruling, 23 FCC Rcd. at 559.  Specifically, the FCC "conclude[d] that the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt."  Id. at 564.  The FCC "emphasize[d] that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed."  Id. at 564-65.  The Commission concluded that "the burden will be on the creditor to show it obtained the necessary prior express consent" because "creditors are in the best position to have records kept in the usual course of business showing such consent."  Id. at 565.  As in the 1992 FCC Order, the Commission found support for its interpretation of prior express consent from the legislative history of the TCPA, including the House Report, which stated that "[t]he restriction on calls to

---

[3] ACA International filed a brief in this case as amicus curiae in support of Gulf Coast.

emergency lines, pagers, and the like does not apply when the called party has provided the telephone number of such a line to the caller for use in normal business communications." Id. at 564 (quoting H.R. Rep. No. 102-317, at 17).

In 2012, the FCC issued still another Report and Order that further interpreted the meaning of the prior express consent exception embodied in § 227(b)(1)(A) of the statute, though the Commission did not change the standard for debt collection calls made to cell phone numbers. See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (2012 FCC Order), 27 FCC Rcd. 1830. The 2012 FCC Order required written prior express consent for autodialed or prerecorded calls to wireless or residential numbers that deliver a telemarketing message. Id. at 1838. It "eliminate[d] the established business relationship exemption for prerecorded telemarketing calls to residential lines" created by the FCC in 1992. Id. at 1845. And the Commission added an exemption for "all prerecorded health care-related calls to residential lines that are subject to HIPAA." Id. at 1852.

## II.

We review the grant or denial of a motion for summary judgment de novo. See Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). In so doing, we draw all inferences and review all evidence in the light most favorable to the non-moving party. Id. Summary judgment is required when "the movant shows that

15

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

A.

The district court exceeded its jurisdiction by declaring the 2008 FCC Ruling to be inconsistent with the TCPA.  Section 402(a) of the Communications Act provides that (except in limited circumstances not relevant here) any "proceeding to enjoin, set aside, annul, or suspend any order of the Commission" must be brought under the Hobbs Act.  47 U.S.C. § 402(a).  The Hobbs Act, in turn, expressly confers on the federal courts of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" such FCC orders.  28 U.S.C. § 2342; see FCC v. ITT World Commc'ns, Inc., 466 U.S. 463, 468 (1984) ("Exclusive jurisdiction for review of final FCC orders . . . lies in the Court of Appeals.").  This procedural path created by the command of Congress "promotes judicial efficiency, vests an appellate panel rather than a single district judge with the power of agency review, and allows 'uniform, nationwide interpretation of the federal statute by the centralized expert agency created by Congress' to enforce the TCPA."  CE Design, Ltd. v. Prism Bus. Media, Inc., 606 F.3d 443, 450 (7th Cir. 2010) (quoting United States v. Dunifer, 219 F.3d 1004, 1008 (9th Cir. 2000)); see Nack v. Walburg, 715 F.3d 680, 685 (8th Cir. 2013), cert. denied, 134 S. Ct. 1539 (2014).  In explaining the reach of the Hobbs

16

Act, the Supreme Court has instructed that, "[a]bsent a firm indication that Congress intended to locate initial APA review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 745 (1985).

Despite these statutory strictures, the district court asserted jurisdiction to review the 2008 FCC Ruling because Mais did not sue with the primary intent "to enjoin, set aside, annul, or suspend" an FCC order, 47 U.S.C. § 402(a), and because Mais's claim did not necessarily depend on invalidation of the agency's ruling. The district court reasoned that the FCC's interpretation of the meaning of the term "prior express consent" could not be reconciled with the statutory language, and therefore it discarded the administrative agency's rulemaking determination. In doing so, the district court exceeded its jurisdiction. "Because the courts of appeals have exclusive jurisdiction over claims to enjoin, suspend, or invalidate a final order of the FCC, the district courts do not have it." Self, 700 F.3d at 461. "That means district courts cannot determine the validity of FCC orders." Id. By refusing to enforce the FCC's interpretation, the district court exceeded its power. "[D]eeming agency action invalid or ineffective is precisely the sort of review that the Hobbs Act delegates to the courts of appeals in cases challenging final FCC orders." CE Design, 606 F.3d at 448.

17

Moreover, Hobbs Act jurisdictional analysis looks to the "practical effect" of a proceeding, not the plaintiff's central purpose for bringing suit. B. F. Goodrich Co. v. Nw. Indus., Inc., 424 F.2d 1349, 1353-54 (3d Cir. 1970) ("The statutory procedure for review is applicable although an order is not directly attacked -- so long as the practical effect of a successful suit would contradict or countermand a Commission order."). The district courts lack jurisdiction to consider claims to the extent they depend on establishing that all or part of an FCC order subject to the Hobbs Act is "wrong as a matter of law" or is "otherwise invalid." Self, 700 F.3d at 462. The Hobbs Act does not ask whether an FCC order was first invoked as part of a plaintiff's claim or as an affirmative defense. See Nack, 715 F.3d at 686 ("'[W]here the practical effect of a successful attack on the enforcement of an order involves a determination of its validity,' such as a defense that a private enforcement action is based upon an invalid agency order, 'the statutory procedure for review provided by Congress remains applicable.'" (quoting Sw. Bell Tel. v. Ark. Pub. Serv. Comm'n, 738 F.2d 901, 906 (8th Cir. 1984))).

In other words, "[w]hichever way it is done, to ask the district court to decide whether the regulations are valid violates the statutory requirements." United States v. Any and All Radio Station Transmission Equip., 207 F.3d 458, 463 (8th Cir. 2000). "The exclusive jurisdiction of the courts of appeals cannot be evaded simply by labeling the proceeding as one other than a proceeding for

18

judicial review." Id. (quoting Sw. Bell Tel., 738 F.2d at 906). And "[a] defensive attack on the FCC regulations is as much an evasion of the exclusive jurisdiction of the Court of Appeals as is a preemptive strike." Id.; see ITT World Commc'ns, 466 U.S. at 468 ("Litigants may not evade [the Hobbs Act] by requesting the District Court to enjoin action that is the outcome of the agency's order."). Put still another way, whether the challenge to an FCC order "arises in a dispute between private parties makes no difference -- the Hobbs Act's jurisdictional limitations are 'equally applicable whether [a party] wants to challenge the rule directly . . . or indirectly, by suing someone who can be expected to set up the rule as a defense in the suit.'" CE Design, 606 F.3d at 448 (alterations in original) (quoting City of Peoria v. Gen. Elec. Cablevision Corp., 690 F.2d 116, 120 (7th Cir. 1982)). In the face of ample federal appellate precedent undermining his argument, Mais has pointed us to no decision from any other court concluding that a district court had jurisdiction to invalidate an order like the 2008 FCC Ruling in a dispute between private litigants.[4]

---

[4] In Leyse v. Clear Channel Broadcasting Inc., 697 F.3d 360 (6th Cir. 2012), a panel of the Sixth Circuit originally held that the Hobbs Act only deprived a district court of jurisdiction "if the action's central object is to either enforce or undercut an FCC order." Id. at 374. Thereafter, however, the panel filed an amending and superseding opinion that abandoned the "central object" analysis and concluded that the Hobbs Act limited the district court's jurisdiction over the plaintiff's claims. See Leyse v. Clear Channel Broad., Inc., 545 F. App'x 444, 459 (6th Cir. 2013) (unpublished) ("[Plaintiff] knew that Clear Channel's defense would depend on the FCC's exemption provision.").

Regardless of which party invoked the 2008 FCC Ruling, then, the district court lacked jurisdiction "to enjoin, set aside, annul, or suspend" it -- precisely what the court did.  47 U.S.C. § 402(a).  "To hold otherwise" and permit a challenge to the 2008 FCC Ruling "merely because the issue has arisen in private litigation would permit an end-run around the administrative review mandated by the Hobbs Act."  Nack, 715 F.3d at 686.  Mais is free to ask the Commission to reconsider its interpretation of "prior express consent" and to challenge the FCC's response in the court of appeals.  See Self, 700 F.3d at 462 (citing 28 U.S.C. § 2344).  But he "may not seek collateral review . . . by filing claims in the district court."  Id.

Moreover, we see no merit to Mais's argument that the 2008 FCC Ruling was not an order within the meaning of the Hobbs Act.  Orders "adopted by the Commission in the avowed exercise of its rule-making power" that "affect or determine rights generally . . . have the force of law and are orders reviewable under the" Hobbs Act.  Columbia Broad. Sys. v. United States, 316 U.S. 407, 417 (1942); see id. at 416 ("The particular label placed upon [an order] by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive.").  The 2008 FCC Ruling is a Hobbs Act final order.  ACA International filed a petition seeking a declaratory ruling clarifying the TCPA's prior express consent exception.  See 47

20

C.F.R. § 1.2(a) ("The Commission may, in accordance with section 5(d) of the Administrative Procedure Act, on motion or on its own motion issue a declaratory ruling terminating a controversy or removing uncertainty."). The FCC sought public comment in accordance with its rulemaking procedures. Consumer & Governmental Affairs Bureau Seeks Comment on ACA International's Petition, 21 FCC Rcd. 3600 (2006); see 47 C.F.R. § 1.415(a) ("After notice of proposed rulemaking is issued, the Commission will afford interested persons an opportunity to participate in the rulemaking proceeding through submission of written data, views, or arguments . . . ."). Creditors and collectors filed comments in support of the petition, while consumer groups and individual consumers submitted comments in opposition. 2008 FCC Ruling, 23 FCC Rcd. at 563-64. Thereafter, the FCC issued its Declaratory Ruling pursuant to its general rulemaking authority to carry out the TCPA. See id. at 567 (citing 47 U.S.C. §§ 227, 303(r)). The 2008 FCC Ruling thus has the force of law and is an order reviewable under the Hobbs Act in the courts of appeals. See Leyse v. Clear Channel Broad., Inc., 545 F. App'x 444, 455 (6th Cir. 2013) (unpublished) ("[T]here is little question that Congress intended FCC rules of the type at issue here to have force of law."). In short, we hold that the district court was without jurisdiction to consider the wisdom and efficacy of the 2008 FCC Ruling.[5]

---

[5] Mais also cites to United States v. Any and All Radio Station Transmission Equipment, 204

21

B.

Although the district court lacked the power to review the validity of the FCC's interpretation of prior express consent, we are obliged to address the alternate holding of the court, that is, whether the facts and circumstances of this case somehow fall outside the scope of the 2008 FCC Ruling.  See Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242, 1257 (11th Cir. 2014) ("[W]e are not called upon here to assess the order's validity.  We are instead simply deciding whether the FCC's . . . ruling is applicable to the present case."); Self, 700 F.3d at 463 (determining "the scope" of an FCC order).

The district court found that the 2008 FCC Ruling did not apply to the medical debt in this case because the Commission had addressed consent only in the context of consumer credit.  But the FCC did not distinguish or exclude medical creditors from its 2008 Ruling.  Quite the opposite, the FCC's general language sends a strong message that it meant to reach a wide range of creditors and collectors, including those pursuing medical debts.  The 2008 FCC Ruling clarified the meaning of "prior express consent" for all "creditors and collectors when calling wireless telephone numbers to recover payments for goods and services received by consumers."  23 FCC Rcd. at 563.  Moreover, the FCC noted

_____

F.3d 658 (6th Cir. 2000), for the proposition that the Hobbs Act does not always strip the district courts of jurisdiction to review FCC orders.  The problem is that case is wholly different.  It involved, as the Sixth Circuit noted, a forfeiture action, which that court characterized as "quasi-criminal" in nature.  Id. at 667.

22

that the debt collection calls at the heart of the 2008 Ruling are primarily regulated under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p, which includes medical bills within its broad definition of "debt": "any obligation . . . of a consumer to pay money arising out of a transaction . . . primarily for personal, family, or household purposes." 15 U.S.C. § 1692a. Indeed, we have recognized that the collection of medical debt can give rise to an FDCPA violation. See, e.g., Bradley v. Franklin Collection Serv., Inc., 739 F.3d 606, 607 (11th Cir. 2014) (per curiam).

While the 2008 FCC Ruling listed the completion of "a credit application" as an example of the provision of a cell phone number to a creditor, the Commission did so illustratively, not exclusively. 23 FCC Rcd. at 564. Similarly, the fact that the FCC's interpretation often is invoked in the context of consumer or commercial creditors does not lessen its application to medical debt collection. See Mitchem v. Ill. Collection Serv., Inc., No. 09 C 7274, 2012 WL 170968, at *1-2 (N.D. Ill. Jan. 20, 2012) (unpublished); Moise v. Credit Control Servs., Inc., 950 F. Supp. 2d 1251, 1253 (S.D. Fla. 2011) ("Based on the plain language of the TCPA and the [2008] FCC order, it is clear that if Plaintiff gave his cell phone number directly to [a medical laboratory], that would constitute express consent."); Pollock v. Bay Area Credit Serv., LLC, No. 08-61101-CIV, 2009 WL 2475167, at *1 (S.D. Fla. Aug. 13, 2009) (unpublished) (applying the 2008 FCC Ruling to calls

23

made by a defendant "attempting to collect a debt . . . that arose from personal medical care").

When it comes to expectations for receiving calls, we see no evidence that the FCC drew a meaningful distinction between retail purchasers who complete credit applications and medical patients who fill out admissions forms like the Hospital's. A patient filling out a form from a healthcare provider may very well expect to be contacted about his health and treatment. But if the form explicitly states that the provided information will be used for payment and billing, the patient has the same reason to expect collection calls as a retail consumer. Though Mais might prefer a different rule, the FCC in no way indicated that its 2008 order distinguishes medical debtors. Florida United, which sought payment for medical services performed for Mais, qualifies as creditor under the 2008 FCC Ruling.

Mais also suggests that the 2008 FCC Ruling does not affect his claim because he did not "provide" his number to "the creditor" -- neither he nor his wife personally transferred his cell phone number to Florida United or its collection agent, Gulf Coast. After all, his wife submitted the admissions forms and the cell phone number to a representative of the Hospital, an entity separate from Florida United and Gulf Coast, and the 2008 FCC Ruling "emphasize[d] that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction

24

that resulted in the debt owed." 23 FCC Rcd. at 564-65 (emphasis added). Boiled down, Mois's argument turns on whether, under the FCC's interpretation of prior express consent, a called party "provides" his cell phone number to a creditor when (during the transaction creating the debt) he authorizes an intermediary to disclose his number to the creditor for debt collection.

The 2008 FCC Ruling does not offer an explicit answer to this question because it does not spell out in detail the meaning of "provide." Based on the regulatory and statutory context, however, we reject Mais's argument that the 2008 FCC Ruling only applies when a cell phone number is given directly to the creditor. Mais's narrow reading of the 2008 FCC Ruling would find prior express consent when a debtor personally delivered a form with his cell phone number to a creditor in connection with a debt, but not when the debtor filled out a nearly identical form that authorized another party to give the number to the creditor. Mais offers no functional distinction between these two scenarios, and we see no sign that the FCC thought a cell phone number could be "provided to the creditor" only through direct delivery. To the contrary, the 2008 FCC Ruling indicated that prior express consent existed when a cell phone subscriber "made the number available to the creditor regarding the debt." 23 FCC Rcd. at 567. Plainly, Mais's wife made his number available to Florida United by granting the Hospital permission to disclose it in connection with billing and payment.

25

In addition, the FCC recently ruled "that the TCPA does not prohibit a caller from obtaining consent through an intermediary." In re GroupMe, Inc./Skype Commc'ns S.A.R.L. Petition, 29 FCC Rcd. 3442, 3447 (2014).  A provider of text messaging services asked the Commission to "clarify that for non-telemarketing voice calls or text messages to wireless numbers . . . the caller can rely on a representation from an intermediary that they have obtained the requisite consent from the consumer."  Id. at 3444.  The FCC after notice and comment issued a Declaratory Ruling that found "the TCPA is ambiguous as to how a consumer's consent to receive an autodialed or prerecorded non-emergency call should be obtained."  Id.  Exercising its interpretive discretion, the FCC explained that "allowing consent to be obtained and conveyed via intermediaries in this context facilitates these normal, expected, and desired business communications in a manner that preserves the intended protections of the TCPA."  Id. at 3445.  Of particular note here, the FCC said that, though the 2008 FCC Ruling "did not formally address the legal question of whether consent can be obtained and conveyed via an intermediary," the earlier order "did make clear that consent to be called at a number in conjunction with a transaction extends to a wide range of calls 'regarding' that transaction, even in at least some cases where the calls were made by a third party."  Id. at 3446.  The FCC's recognition of "consent obtained

26

and conveyed by an intermediary," id., strongly supports our conclusion that Mais's wife "provided" the cell phone number to the creditor through the Hospital.

Other FCC explications of the prior express consent exception also show that the appropriate analysis turns on whether the called party granted permission or authorization, not on whether the creditor received the number directly. See 2012 FCC Order, 27 FCC Rcd. at 1839 ("[R]equiring prior written consent will better protect consumer privacy because such consent requires conspicuous action by the consumer -- providing permission in writing -- to authorize autodialed or prerecorded telemarketing calls . . . ."); 1992 FCC Order, 7 FCC Rcd. at 8769 ("[P]ersons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."). This conclusion is consistent with the legislative history: the House and Senate Reports explain that the TCPA imposes liability for calls made without the called party's "prior express invitation or permission." H.R. Rep. No. 102-317, at 2, 3, 13; S. Rep. No. 102-177, at 16 (1991). Thus, under the 2008 FCC Ruling a cell phone subscriber like Mais could provide his number to a creditor like Florida United -- and grant prior express consent to receive autodialed or prerecorded calls -- by affirmatively giving an intermediary like the Hospital permission to transfer the number to Florida United for use in billing.

27

Mais, through his wife, gave the hospital just such permission.  On his behalf, Mais's wife gave his cell phone number to a Hospital representative.  She received the Hospital's Notice of Privacy Practices, which informed her that "[w]e may use and disclose health information about your treatment and services to bill and collect payment from you, your insurance company, or a third party payer," and that "[w]e may also use and disclose health information . . . [t]o business associates we have contracted with to perform the agreed upon service and billing for it."  The Notice explained that, when services are contracted with business associates, including "physician services in the emergency department and radiology," the Hospital "may disclose your health information to our business associate so that they can perform the job we've asked them to do and bill you."  Mais's wife signed a Conditions of Admission form in which she acknowledged receiving the Notice of Privacy Practices and "permit[ted] the hospital and the physicians or other health professionals involved in the inpatient or outpatient care to release the healthcare information for purposes of treatment, payment or healthcare operations."  We have little doubt that by signing the admissions forms Mais's wife agreed to allow the Hospital to transmit his health information to Florida United so it could bill him for services rendered.[6]

---

[6] Mais relies on a materially distinguishable district court case.  In Moise, a plaintiff claimed that she had not given prior express consent as interpreted in the 2008 FCC Ruling because she had not provided her cell phone number to the creditor, an independent medical laboratory, and

Mais points out that the FCC concluded in its 2008 Ruling that "prior express consent provided to a particular creditor will not entitle that creditor (or third party collector) to call a consumer's wireless number on behalf of other creditors, including on behalf of affiliated entities." 23 FCC Rcd. at 565 n.38. Here, however, the Hospital did not call Mais on behalf of Florida United. Nor did the Hospital give Mais's number to a debt collector to make unauthorized calls on behalf of other creditors. Instead, with explicit permission from Mais's wife, the Hospital passed his cell phone number to Florida United, the creditor who provided radiology services to Mais during his hospitalization. Because Mais's wife specifically authorized that transfer of health information for billing purposes, "the wireless number was provided by the consumer to the creditor" in satisfaction of the prior express consent exception. Id. at 564.

Mais finally argues that the term "health information" as used in the Hospital admissions forms does not include his cell phone number. We disagree. The Notice of Privacy Practices refers to "health information" as the contents of

---

instead had given it only to her doctor. 950 F. Supp. 2d at 1252-53. The district court explained, "if the number was given only to Plaintiff's treating physician, then Plaintiff did not give prior express consent to [the laboratory] or its third party collector." Id. at 1253. However, the court concluded that "[t]o whom Plaintiff gave his number remains an issue for trial." Id. In addition, and in contrast to this case, the district court noted that "the facts do not indicate whether Plaintiff gave his number to his doctor knowing that the doctor would share that number with other creditors of Plaintiff or for the express purpose of giving his number to other creditors." Id. at 1254. Here, Mais's wife gave the Hospital permission to pass on the cell phone number to Florida United in connection with the debt.

29

the record created by a health care provider, which includes a patient's "symptoms, examination and test results, diagnoses, treatment, a plan for future care or treatment and billing-related information."  The cell phone number listed by Mais's wife on the Hospital admission form was part of the record from his visit and was contact information related to billing.  Mais observes that, at one point, the Notice explains that the Hospital "may use and disclose health information <u>about your treatment and services</u> to bill and collect payment."  (emphasis added).  This additional language does not exclude cell phone numbers; after all, contact information can be quite relevant to treatment and services.  Other provisions describe the hospital's policy of disclosing health information for billing and payment without the "treatment and services" qualifier.  And the Notice elsewhere makes clear that "health information" covers contact information like cell phone numbers because it tells patients that the Hospital may "use and disclose health information . . . [t]o remind you that you have an appointment for medical care; [t]o assess your satisfaction with our services; . . . [and] [t]o contact you as part of fundraising efforts."  It is hard to see how the Hospital or outside entities could communicate appointment reminders, survey patient satisfaction, or make fundraising requests without using contact information like cell phone numbers.

Statutory definitions found in HIPAA also support this interpretation.  We agree with the district court that HIPAA compliance does not automatically ensure

30

that a defendant falls within the prior express consent exception to the TCPA. The two statutes provide separate protections, and satisfaction of the first does not trigger compliance with the second. Nor has the FCC issued an order ruling that satisfaction of HIPAA amounts to prior express consent to make autodialed or prerecorded debt collection calls to a cell-phone number. Still, HIPAA's definition of "health information" informs the meaning of the term when the Hospital used it in a required HIPAA notice. See 45 C.F.R. § 164.520(a)(1) ("[A]n individual has a right to adequate notice of the uses and disclosures of protected health information . . . ."). In line with the Hospital's Notice, HIPAA defines "health information" to include "any information . . . created or received by a health care provider" that "relates to . . . the past, present, or future payment for the provision of health care to an individual." 42 U.S.C. § 1320d(4); see id. § 1320d(6) ("The term 'individually identifiable health information' means any information, including demographic information collected from an individual, that -- (A) is created or received by a health care provider . . . and (B) relates to . . . the past, present, or future payment for the provision of health care to an individual, and -- (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual."). As reflected on a Registration Form, the Hospital received Mais's wireless number, a piece of information related to future payment.

31

Ultimately, by granting the Hospital permission to pass his health information to Florida United for billing, Mais's wife provided his cell phone number to the creditor, consistent with the meaning of prior express consent announced by the FCC in its 2008 Ruling.  Gulf Coast is entitled to summary judgment precisely because the calls to Mais fell within the TCPA prior express consent exception as interpreted by the FCC.  Under the Hobbs Act, the district court lacked jurisdiction to review the Commission's interpretation.  Therefore, we reverse the partial grant of summary judgment to Mais and remand to the district court with instructions to enter summary judgment in favor of Gulf Coast on its prior express consent defense.

**REVERSED AND REMANDED.**