NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0417n.06

No. 20-1864

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SAMANTHA NEWELL,

    Plaintiff-Appellant,

v.

CENTRAL MICHIGAN UNIVERSITY BOARD OF TRUSTEES; DEBORAH SILKWOOD-SHERER,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)

FILED
Sep 02, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

---

BEFORE: GRIFFIN, WHITE, and READLER, Circuit Judges.

GRIFFIN, Circuit Judge.

Samantha Newell claims that Central Michigan University failed to provide her certain accommodations for her disability in a timely manner and subjected her to a hostile educational environment while she was a doctoral student in the university's Physical Therapy Program. She also contends Dr. Deborah Silkwood-Sherer, the program's director, violated her right to bodily integrity by not exempting her from physical treatments within the program curriculum that caused her physical harm. The district court entered judgment for defendants in two orders, and we affirm.

I.

A.

Plaintiff Samantha Newell suffers from a genetic disorder that she describes as a combination of hypotonic cerebral palsy and a connective-tissue condition like Marfan syndrome.

Her disorder manifests in several ways, including hypermobility, joint instability and pain, general lack of strength, as well as learning and cognitive disabilities and sensory processing issues.

She entered Central Michigan University's Physical Therapy Program in May 2016 and worked with the university's Student Disability Services (SDS) office to coordinate accommodations. The director of SDS, Lynne L'Hommedieu, provided plaintiff with letters indicating that she was entitled to extra time for tests, a separate testing area, and alternative test formats. It was Newell's responsibility to give a copy of the letter to each of her professors.

After a relatively uneventful first semester (Summer 2016), plaintiff began to have problems with some aspects of her schooling. In the Fall 2016 semester, she was either late or absent for several required class sessions. For example, she arrived 50 minutes late to one of her exams and forgot to attend a laboratory session for the same professor's class, offering no explanation for her failure to attend.

During the Fall 2016 semester, Newell was also required to experience electronic stimulation ("e-stim") as part of Patient Care Lab I with Drs. Timothy Zipple and Elaine Betts on two or three occasions, which transmits a small electrical current through the body to treat maladies like muscle spasms and mild nerve damage. She and a partner took turns setting up the e-stim machine and applying it to each other. Plaintiff suffered "severe headaches, fatigue, and sleep issues" from the e-stim treatment. When she reported this to the SDS office, L'Hommedieu arranged a meeting between Newell, Dr. Silkwood-Sherer, and herself. As a result of the meeting, Dr. Silkwood-Sherer agreed that for purposes of the practical exam, Newell's partner could set up the machine but not perform the treatment upon her so long as the professors teaching the class approved. While there was some confusion over this because plaintiff did not raise the issue with

the professors teaching the course until exam day, she ultimately did not experience e-stim during the practical exam.

Once the Fall 2016 semester ended, L'Hommedieu sent Newell an email to "touch base . . . regarding how to work out your accommodations in Spring and forward." She stated that "including me in the discussion with your professors and Dr. Silkwood-Sherer really doesn't help," because she did not "understand enough about the program" and including her in discussions meant that the professors would "have to teach me what is required to function in the program." Thus, she recommended that "in the future it will be best for you to go directly to your professors and include Dr. Silkwood-Sherer on e-mails" without copying L'Hommedieu.

On January 5, 2017, before the next semester began, Newell wrote a letter to her professors requesting several additional accommodations primarily relating to her sensory-processing disorder. For instance, she requested a modified attendance policy that would allow her to rely on class recordings. She also requested the ability to use headphones during lab work and while taking tests. Finally, plaintiff recounted her struggles the previous semester with e-stim. She explained that she was concerned "about what other modalities or treatments" might do to her in the future. She closed this portion of the letter by stating: "I will try anything, but if I notice problems, I hope that I'll be accommodated." The letter offered no other specifics as to any accommodations request regarding classroom demonstrations. Dr. Silkwood-Sherer responded, cautioning that the faculty might not be able to grant all of Newell's requested accommodations because they would hinder her ability to practice in clinical rotations. On January 11, Newell responded that she "underst[ood] that all the thoughts/ideas presented in my letter [would] not all be implemented." Newell later testified that the January 5 letter was not requesting specific accommodations that would "excuse [her] from receiving any types of . . . treatments in class."

On January 17, 2017, Newell sent another email to Dr. Silkwood-Sherer. She reported that the previous week, while in a class with Dr. Zipple, he used Newell as a demonstration patient to teach the "spinal spring test" (a method of spinal manipulation), and the Friday after class, January 13, she had to miss class with a bad migraine. She thought the migraine might have been due to the spinal spring test and concluded the letter by stating: "I think that manipulating my spine affected me a lot. . . . I may need to be accommodated to only give and not receive the spinal manipulation treatments. I am going to talk to my physician and PT that know my condition best on whether having my spine manipulated would cause these issues."

That same day, the faculty, with SDS present, took up discussion of Newell's January 5 letter in a faculty meeting. They denied her requests for a modified attendance policy and for noise-canceling headphones. They concluded that she "need[ed] to be a patient/participant in labs" but did not consider whether she should be exempt from demonstrations performed by the professor. However, the faculty granted plaintiff access to prior years' video recordings of lectures, allowed her to wear earplugs during testing (as opposed to headphones), and promised that they would not "overwork" Newell's joints and tissue during labs, as they had done for previous students with hypermobility.

In addition to discussing the accommodations Newell requested, the faculty discussed their collective perception that she lacked professionalism or otherwise was not fully engaged in the program. The meeting agenda specifically noted six behaviors of Newell's that concerned them:

| | |
|---|---|
| ii. | Student does not self-assess well. She feels that she is below her classmates. She worries about things that have not happened, yet. |
| iii. | Student has not followed up on exercises that were given to her by Dr. Haines to improve her strength and ability to work safely with patients. |
| iv. | Student has only met with her advisor once since entering the program. |
| v. | Student has not followed up with Dr. Zipple on an email that he sent her. |

vi.     Student has not given Dr. Betts a letter from Student Disability Student Services this semester

vii.    Dr. Betts told student that she would work with her biomechanics[;] student did not follow through.

They therefore created a "Professional Behavior Contract" for Newell to sign, through which she would promise to attend a weekly meeting with her advisor, attend all classes and meet with at least one professor per week during office hours, and "take her turn being a patient in lab." Finally, the faculty recognized that plaintiff was "performing academically up to the class standard," but that she needed "feedback to that effect" and a "confidence building chat."

According to Newell, the Spring 2017 semester was a disaster. She alleges suffering numerous injuries because of treatments performed on her by her student-partners during lab and/or by her professors in class demonstrations. But she did not raise these injuries with the faculty or the SDS office in January or February 2017, despite many email exchanges with both.[1] Her struggles with attendance and professionalism also continued. On one occasion in early February, she arrived one hour late for class. Then, on February 26, 2017, she scheduled two tests for different classes at the same time. Because of these developments, Newell was again a subject of discussion for the faculty. At a meeting in late February 2017, the faculty decided to issue a written warning to Newell along with "a formal behavioral contract."

To that end, Newell's faculty advisor, Dr. Jan Perkins, sent her an email during spring break on March 7, 2017, outlining the behavioral issues discussed above. She told Newell that they needed to meet "as early after break" as they could to discuss the faculty's expectations for

---

[1] Newell later created a list of the "labs that caused problems for my joints," mainly in a class focused on mobilization techniques. In one lab, she says she tore her right hip labrum. She testified in her deposition that she never told her professors about the injury. ("Q. But you didn't tell Dr. Zipple you'd been injured that day, right? A. I didn't tell him, no. Q. Did you tell Dr. Sung? A. No. I don't recall telling Dr. Sung, no. I tried to avoid the professors because I didn't want to be considered, you know, a baby[.]").

her. Newell responded six days later that "a meeting to define expectations [was] a great idea." She added that she had "quite a few disability accommodation expectations that still need[ed] to be addressed as well." Newell further explained that her "parents [felt] as though [her] disability attorney's office should be involved and . . . sent them a retainer. So, a representative from that office will be at that meeting with me . . . . We can expect that we can be ready to start a discussion in about two weeks."

Then, on March 15, 2017, Newell sent an email to the faculty raising concerns about being required to undergo physical treatments as part of her lab work. She explained that the treatments were "contraindicated" for her condition, so even if done "mildly," they were causing her harm. She added, "I am understanding that although I have a medical diagnosis of hypermobility and hypotonia, I am still expected to endure mobilizations. I've asked several of you about this and I get the same answer, which is that if done mildly, it will be fine." She stated that she had "been having substantial physical negative side effects from this on a regular basis" and could "get medical documentation about the issues if needed." The email concluded: "So, one more time, I just need to make sure that you all understand this and yet you still want me to continue to endure this procedure. Thank you."

Dr. Silkwood-Sherer responded on March 17, 2017, writing on behalf of all of Newell's professors. She stood by the faculty's position that they were able to modify treatment techniques to help Newell satisfy the program requirements, and that mobilizations were not contraindicated for her if performed correctly. Silkwood-Sherer also stated that they could not excuse plaintiff from lab activities because it would "violate[] the policy of treating everyone the same, unless there are documented accommodations." She added that the "fact that you are sending this email[] just reinforces why we need to meet. We need to have a *dialogue* on exactly what issues you are

having[.]" She therefore urged Newell to schedule the anticipated meeting "as soon as possible" so they could "problem solve for possible solutions that could be satisfactory for everyone."

Newell next emailed Dr. Zipple the following day, March 18. She stated that every time he performed a mobilization technique upon her, she needed medical treatment. She also stated that her "lab partners were always careful" when performing treatments, so she "did not seem to have as many issues when it [was] only [her] lab partner that work[ed] on [her]." Newell cited two occasions where Dr. Zipple had performed treatments on her that caused "out of control" pain. Because of this, she requested that "only her [lab partner]" perform manual therapy on her in upcoming class sessions. She also suggested that she could be put in a group of three or four students, so she would not need to act as a patient if a particular treatment posed problems. Alternatively, she asked "at a minimum" that Dr. Zipple demonstrate on a student other than Newell when her partner asks a question and that she not be "used in class demonstrations." The faculty noted this email and flagged it for discussion in the forthcoming meeting.

The meeting was scheduled for March 28. On that day, Newell sent a letter to Silkwood-Sherer, L'Hommediue, and Perkins. It expressly requested several accommodations, including that Newell be in groups of three during lab work so that her classmates would have someone else to practice on if Newell was "unable to participate." It also asked for an "[e]xemption from any in-class treatment demonstrations unless [she] volunteer[ed]."

The March 28 meeting lasted nearly two hours and covered both the faculty's concerns with plaintiff's conduct and her need for further accommodations. During the meeting, Newell explained that she had recently suffered "some kind of hip sprain" after she "let [her] partner push . . . too hard." She feared that "if she said no," or told her partner to stop, she would "get in trouble somehow." Dr. Silkwood-Sherer responded that she did not understand why Newell would get in

trouble for communicating to her lab partner that she needed to stop the treatment. Moreover, she explained that the program expected students to tell their partners when they were pushing too hard and that communication between the pair should be "happening all the time." Regarding Dr. Zipple's demonstrations, Dr. Silkwood-Sherer urged Newell to meet with him in person to discuss her concerns. At the end of the faculty meeting, Newell received a written warning for her professionalism issues.

Dr. Zipple demonstrated a technique on Newell one more time, on April 5, when he performed a mobilization on the outside of her knee during a lab. This did not lead to serious injury, but it did cause Newell's knee to feel looser.

On April 6, Newell met with CMU's Office of Civil Rights and Institutional Equity (OCRIE) to file a formal civil rights complaint. OCRIE investigated between April 6, 2017, and July 11, 2017. During the investigation, it recommended that the Physical Therapy faculty refrain from meeting with Newell to discuss class-specific accommodations. Plaintiff's last manual therapy lab session for the Spring 2017 semester occurred on April 10, 2017. She sprained her ankle during that lab after a classmate began doing "lateral subtalar glides too fast" on her foot, causing a "pop" and pain. SDS worked with Newell and the Physical Therapy faculty to structure Newell's practical exams—taking place at the end of April and beginning of May—so that they did not require her to experience any type of mobilization or intervention technique. Newell completed those exams without issue.

OCRIE completed its investigation into Newell's complaint on July 11, 2017. It resulted in CMU withdrawing the written warning, and Newell receiving a formal accommodation letter that permitted her to avoid participating in mobilizations she deemed harmful during labs. Dr. Silkwood-Sherer opposed this accommodation but said that she would "obviously have to live

with it." On July 7, just prior to the issuance of Newell's formal accommodations, Dr. Zipple offered a similar, informal accommodation at the start of his class with Newell during the Summer 2017 semester, providing that she could choose not to have techniques performed on her that she deemed potentially hazardous and would not be selected as a demonstration model by course faculty.

After receiving the formal accommodation, Newell had no further issues with the classroom portions of her education. She was, however, terminated from her clinical placement in the Fall of 2018 at the request of her clinical supervisor. In the request to cease the placement, the supervisor reported that Newell had "compromised the standard of patient care" at the facility. Because of plaintiff's termination from her clinical placement, she was subject to dismissal from the Physical Therapy Program, but the faculty instead allowed her to remediate. Around the same time, she took a medical leave after being diagnosed with a labral tear in her right hip.

As of the time of the complaint, Newell had completed the classroom requirements for graduation from the program with a 3.67 GPA but had not returned to finish the clinical requirements. Newell has since returned to the program and is wrapping up the remaining clinical work required for graduation.

B.

Newell filed suit in July 2019. In her operative complaint, she pleaded five counts: (1) failure to grant reasonable accommodations against CMU; (2) retaliation for protected activity under the Americans with Disabilities Act and Rehabilitation Act against CMU; (3) interference with rights protected under the ADA and Rehabilitation Act against CMU; (4) "Hostile Educational Environment" under the ADA and Rehabilitation Act as to CMU; and (5) violation of her right to bodily integrity under the Fourteenth Amendment as to Dr. Silkwood-Sherer.

After answering the complaint, Dr. Silkwood-Sherer moved for judgment on the pleadings. She argued that the facts in Newell's complaint failed to allege a violation of her right to bodily integrity, that she could not be held liable for the constitutional violation on a theory of supervisory liability, and that she was entitled to qualified immunity because even assuming a plausible claim of a constitutional violation, the law was not clearly established. After full briefing, the district court granted the motion, ruling that Dr. Silkwood-Sherer was entitled to qualified immunity.

Following discovery, CMU moved for summary judgment on the remaining ADA and Rehabilitation Act claims. The district court granted the motion. As relevant to the appeal, it ruled that no reasonable juror could find that CMU denied Newell reasonable accommodations (either by failing to engage in the interactive process or by constructively denying an accommodation), and that her claim for a hostile educational environment failed because even assuming such a claim exists, plaintiff had not proffered evidence that she had subjectively experienced an abusive educational environment.[2] Having dismissed all of plaintiff's claims, the court entered judgment, and Newell timely appealed.

## II.

We begin with the district court's order granting judgment on the pleadings to Dr. Silkwood-Sherer. Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "We review de novo a judgment on the pleadings granted pursuant to

---

[2]The court also held that plaintiff's retaliation claim failed because there was no evidence that CMU took adverse action against her for requesting accommodation and that her ADA and Rehabilitation Act claims for interference with a protected right failed because no reasonable juror could find that defendants had coerced, threatened, or interfered with Newell's protected activity or that CMU was motivated by an intent to discriminate. Newell does not challenge those rulings on appeal.

Rule 12(c) . . . using the same standard that applies to a review of a motion to dismiss under Rule 12(b)(6)." *Moore v. Hiram Twp.*, 988 F.3d 353, 357 (6th Cir. 2021).

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Jackson v. Prof'l Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017) (citation omitted). "But we need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (internal quotation marks and citation omitted). "A Rule 12(c) motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Id.* (internal quotation marks and citation omitted).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007) (citation omitted). However, qualified immunity shields government officials performing discretionary functions from liability if they have violated an individual's constitutional right, but that right was not "clearly established" when the officials acted. *Id.* (citation omitted). Thus, a two-part test determines whether qualified immunity applies: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Colvin v. Caruso*, 605 F.3d 282, 290 (6th Cir. 2010) (citation omitted). "We are free to consider the two-part test in whatever order is appropriate in light of the issues before us." *Id.* (internal quotation marks, citation, and brackets omitted); *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"Although a defendant's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Moderwell v. Cuyahoga County*, 997 F.3d 653, 660 (6th Cir. 2021) (internal quotation marks and citation omitted). "The reasoning for our general preference is straightforward: Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is obvious or squarely governed by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not for purposes of determining whether a right is clearly established." *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (internal quotation marks and citation omitted). We recently stated that "'it is generally inappropriate for a . . . court to grant a [12(c) motion for judgment on the pleadings] on the basis of qualified immunity.'" *Moderwell*, 997 F.3d at 661 (alteration in original) (quoting *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015)). But we have also affirmed grants of judgment on the pleadings where the plaintiff did not plead a clearly established substantive due process violation, so this statement is not an absolute prohibition. *See, e.g.*, *Clark v. Stone*, 998 F.3d 287, 299–300 (6th Cir. 2021); *Jasinski v. Tyler*, 729 F.3d 531, 538–40 (6th Cir. 2013).

When considering qualified immunity at the Rule 12 phase, "we ask whether the complaint plausibly alleges that an official's acts violated the plaintiff's clearly established constitutional right." *Siefert v. Hamilton County*, 951 F.3d 753, 762 (6th Cir. 2020) (internal quotation marks and citation omitted). "If, taking all the facts as true and reading all inferences in the plaintiff's favor, the plaintiff has not plausibly showed a violation of his clearly established rights, then the []defendant is entitled to immunity from suit." *Id.* In other words, "[j]ust as we gauge other pleading-stage dismissals to determine only whether the complaint states a claim upon which relief can be granted, . . . so we review an assertion of qualified immunity to determine only whether the

complaint adequately alleges the commission of acts that violated clearly established law." *Back v. Hall*, 537 F.3d 552, 555 (6th Cir. 2008) (citation omitted).

The district court first concluded that Newell pleaded a plausible bodily-integrity claim, but then concluded that "the same facts" that rendered the claim *plausible* were "insufficient to *demonstrate* a violation of Plaintiff's right to bodily integrity" (emphasis added). That did not conform to the proper analysis, which asks if (1) Newell adequately alleged a violation of a constitutional right that (2) was clearly established. While the district court could take those questions in the order it deemed most appropriate, it appeared to improperly chart a third course by concluding that Newell adequately alleged but did not "demonstrate" a violation.

Nevertheless, we need not decide whether Newell pleaded facts which plausibly give rise to a constitutional violation, *Pearson*, 555 U.S. at 269, for she has not alleged a violation of clearly established law, *see Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 887 (6th Cir. 2020) ("This court can affirm a decision of the district court on any grounds supported by the record, even if different from those relied on by the district court." (brackets and citation omitted)).

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks and citation omitted). Therefore, the clearly established right must be defined with "specificity," and not "at a high level of generality." *Id.* "Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was unconstitutional." *Guertin*, 912 F.3d at 932 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The focus must be "whether the violative nature of *particular* conduct is clearly established . . . in light of the specific context of the case." *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

That is not to say that qualified immunity requires a prior decision "on all fours" to "form the basis for the clearly established right." *Id.* Instead, the test is whether "existing precedent must have placed the . . . constitutional question beyond debate." *Id.* This means there must either be "controlling authority or a robust consensus of cases of persuasive authority." *Plumhoff v. Rickard*, 572 U.S. 765 (2014) (internal quotation marks omitted). "[A]n action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015) (citing *Hope*, 536 U.S. at 742–44).

Newell says Silkwood-Sherer violated her right to bodily integrity. That right "bears an impressive constitutional pedigree." *Doe v. Claiborne County*, 103 F.3d 495, 506 (6th Cir. 1996). A bodily-integrity claim must show that the government action "'shocks the conscience and violates the decencies of civilized conduct.'" *Guertin*, 912 F.3d at 918; *accord In re Flint Water Cases*, 960 F.3d 303, 324 (6th Cir. 2020). The "'measure of what is conscience shocking is no calibrated yard stick,' nor is it 'subject to mechanical application.'" *Guertin*, 912 F.3d at 923 (citations omitted). Mere negligence is insufficient. *Id.* Deliberate indifference can suffice, but it depends on context. *See id.* ("'Deliberate indifference that shocks in one environment may not be so patently egregious in another[.]'" (citation omitted)).

Here, the district court ruled that Newell's Fourteenth Amendment right to be free from intrusions to her bodily integrity were clearly established by *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), *Domingo v. Kowalski*, 810 F.3d 403 (6th Cir. 2016), and *Webb v. McCullough*, 828 F.2d 1151 (6th Cir. 1987). It defined the right at issue only at a very high level of generality. ("The Sixth Circuit has held that there is a constitutional right to bodily integrity on multiple occasions. . . . Plaintiff's right to bodily integrity is a well-established right."). *But see Ashcroft v.*

*Al-Kidd*, 563 U.S. 731, 742 (2011) ("[C]ourts . . . [should not] define clearly established law at a high level of generality."). A review of the cases the district court cited confirms that Dr. Silkwood-Sherer could not have been on notice that declining Newell's request to be exempted from physical treatments, as part of her assigned coursework, would constitute a violation of her right to bodily integrity under the Substantive Due Process Clause of the Fourteenth Amendment.

First, to describe the facts of *Claybrook* is to distinguish it. It involved an innocent bystander injured by a police-pursuit-gone-wrong, 199 F.3d at 354–55, so it could not possibly have put Dr. Silkwood-Sherer on notice that her "particular conduct" would violate Newell's right to bodily integrity. *Guertin*, 912 F.3d at 932.

The second case, *Domingo*, comes slightly closer to the mark, but only because it is set in an educational environment. There, several elementary-age students alleged that their special-education teacher violated their Fourteenth Amendment rights by, "among other things, gagging one student with a bandana to stop him from spitting, strapping another to a toilet to keep her from falling from the toilet, and forcing yet another to sit with her pants down on a training toilet in full view of her classmates to assist her with toilet-training." 810 F.3d at 406. We found no substantive-due-process violation, reasoning in part that "[t]he evidence establishe[d] that [defendant] attempted to toilet-train and control her special-education students in furtherance of valid pedagogical goals," so even if the "educational and disciplinary methods . . . may have been inappropriate, insensitive, and even tortious[,] they were not unconstitutional." *Id.* at 416. The behavior in *Domingo* was far more troubling—and further removed from normal educational practices—than that allegedly taken by Silkwood-Sherer: requiring Newell to participate in the same standard educational program as everyone else, a valid pedagogical goal. *Domingo* could not have put Silkwood-Sherer on notice that she was committing a constitutional violation.

*Webb* is also readily distinguishable. There, the defendant, McCullough, was a high school principal chaperoning a school trip. He discovered that a group of students possessed beer and wine in violation of school rules. 828 F.2d at 1154. McCullough told the students that they would be sent home early from the trip. *Id.* In response, the plaintiff, Webb, locked herself in a bathroom. *Id.* McCullough allegedly broke down the bathroom door, struck Webb with the door, threw her to the floor, and then slapped her. *Id.* She later filed suit raising Fourth and Fourteenth Amendment violations against McCullough. On appeal, we reversed the district court's grant of summary judgment in favor of defendant, commenting that the record did not reflect that the "alleged blows inflicted upon Webb were in any way disciplinary." *Id.* at 1158. Therefore, it "raise[d] the possibility that the alleged blows violated Webb's substantive Fourteenth Amendment due process rights" because "it [was] possible that the blows were not disciplinary in nature, [and] a trier of fact could find that under the circumstances, McCullough's need to strike Webb was so minimal or non-existent that the alleged blows were a brutal and inhumane abuse of McCullough's official power, literally shocking to the conscience." *Id.* at 1159. Nothing about that case would suggest that Dr. Silkwood-Sherer's failure to excuse plaintiff from participating in manual therapy activities would similarly constitute a conscience-shocking violation of her constitutional right to bodily integrity.

In sum, the district court went astray by defining the constitutional right at issue with a high level of generality, which runs contrary to the Supreme Court's command to the contrary. *Al-Kidd*, 563 U.S. at 742. We conclude that a reasonable official in Dr. Silkwood-Sherer's shoes would not understand from *Claybrook*, *Domingo*, or *Webb*—or any other authority that has been cited in this action—that Newell's right to bodily integrity would be violated if she were required

to continue participating in physical treatments that were legitimate pedagogical exercises for physical therapy students.

Accordingly, we affirm the district court's grant of Dr. Silkwood-Sherer's motion for judgment on the pleadings on the alternative ground that she is entitled to qualified immunity for lack of clearly established law.

### III.

Plaintiff also appeals the district court's grant of summary judgment to CMU on two of her statutory claims under the Americans with Disabilities Act and/or Rehabilitation Act.[3] We review the district court's summary judgment determination de novo. *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We consider all facts and inferences drawn therefrom in the light most favorable to the nonmovant." *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001).

### A.

Newell claims that CMU failed to grant her reasonable accommodations in violation of the ADA. "A plaintiff asserting a violation of the ADA or Rehabilitation Act bears the burden to establish that [s]he is qualified." *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015) (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012)). Accordingly, it is the student's obligation to propose an accommodation and establish that it is reasonable. *See id.* "A publicly funded university is not required to provide accommodation to a

---

[3]Because the Americans with Disabilities Act and Section 504 of the Rehabilitation Act share the same remedies, procedures, and rights, we analyze plaintiff's claims brought pursuant to those laws together. *See Thompson v. Williamson County*, 219 F.3d 555, 557–58 (6th Cir. 2000).

student under the ADA or Rehabilitation Act until the student provides a proper diagnosis of his claimed disability and specifically requests an accommodation." *Id.* (citation omitted).

Newell's claim here is not that CMU failed to accommodate her disability. It did. Instead, she contends that the delay between the time she first requested accommodations for her manual therapy labs and the time CMU granted them was unreasonable, and as such, constituted a constructive denial of her accommodation request in violation of the ADA. While we have not yet directly considered whether this theory is actionable under the ADA or Rehabilitation Act (or set forth a legal framework for establishing such a violation if cognizable), the district court surveyed several in-circuit district court opinions, and ultimately adopted the four-factor test set forth in *Edmunds v. Board of Control of Eastern Michigan University*, No. 09-11648, 2009 WL 5171794 (E.D. Mich. Dec. 23, 2009). That test, however, has not been adopted by this Court.

Newell's claims can instead be resolved under existing case law. We have stated that "causing unnecessary delays or obstructing the process" may constitute an example of failure to engage in the good-faith interactive process, as required by the ADA. *Brumley v. UPS*, 909 F.3d 823, 840 (6th Cir. 2018). But as we have also previously explained, a defendant "need not immediately implement or accept accommodations" proposed by a student or face liability for disability discrimination. *See Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812–13 (6th Cir. 2020) ("[A] delay in providing a reasonable accommodation is not always actionable."). And in an unreported decision, we stated that a plaintiff "cannot base a disability discrimination claim upon a [university]'s delay in providing an accommodation where the delay is due to internal processing or events outside the [university]'s control." *Gerton v. Verizon S. Inc.*, 145 F. App'x 159, 168 (6th Cir. 2005) (citing *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 342, 437 (6th Cir. 1998)). That appears to be the case for much of the delay at issue here. From April 6,

2017 to July 11, 2017, the delay in granting a formal accommodation was attributable to OCRIE's investigation of Newell's civil rights complaint. And, it bears adding, Newell last underwent manual therapy on April 10. By exam season—the end of April and beginning of May—Newell was already being informally accommodated; she was excused from receiving any manual demonstrations during exams. Accordingly, while Newell did not receive her formal accommodation letter until July, the delay after the last class session on April 10 was entirely harmless, and the university began taking steps to accommodate her far earlier in the process.

The remaining length of the delay attributable to CMU was not unreasonable. Whether we consider the length of time between Newell's request that she not participate in class demonstrations with her professor, or her request to be excused from student-on-student physical treatments in labs, we conclude that any delay on CMU's part was reasonable in light of all the circumstances. Considering Newell's request to be excused from student-led manual therapy, the delay, functionally, was only around one-to-two months. Reading the record in her favor, Newell's March 15 email—though phrased somewhat vaguely—could constitute a request to be exempt from student-on-student demonstrations,[4] but by the end of April, CMU excused her from student demonstrations during final exams, and she last was subjected to one on April 10. And as noted above, the delay between April 6 and the formal letter on July 7 was due to internal processing prompted by Newell's civil rights complaint. The record also reveals efforts by faculty—during the alleged delay period—to engage in good faith efforts to create a dialogue with Newell. We agree with the district court that, in light of the overall context of this case, CMU's delay was

---

[4]We note that three days later, in her March 18 email to Dr. Zipple, Newell noted that she did not usually have issues with her classmates performing techniques on her, sending mixed messages to the faculty. Still, though, we must read the record in Newell's favor at this stage.

"limited" in nature and not suggestive of a constructive denial of accommodation in violation of the ADA.

Arguing to the contrary, Newell contends that the district court erred by using March 2017 rather than January 2017 as the starting point for the delay in requested accommodations. But rather than rely on record evidence to support her argument, Newell relies solely on allegations from her First Amended Complaint (which is not even the operative complaint in the action). Because this complaint was not verified, it is not an admissible exhibit for Rule 56 purposes. *See King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017). While we review the district court's grant of summary judgment de novo, it is plaintiff's obligation to support her argument for reversal with record evidence that establishes a genuine dispute of material fact for trial. *See Brenay v. Schartow*, 709 F. App'x 331, 336 (6th Cir. 2017) ("[I]t is not for the court to search the record and construct arguments. Parties must do that for themselves."). Newell fails to do so here.

What is more, CMU acted reasonably throughout the duration of Newell's alleged period of delay. CMU provided multiple alternative accommodations before and during the Spring 2017 semester and met with her several times to engage in the interactive process, which the district court correctly interpreted to be signs of good faith. *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202–03 (6th Cir. 2010).

Newell argues that CMU did not engage in good faith because it "only reached out to [her] to schedule a meeting regarding the disciplinary action," and that it did not schedule a meeting to discuss her accommodations. But the record tells a different tale. At the time Dr. Perkins emailed Newell to set up the disciplinary meeting, the sole issue up for discussion was plaintiff's perceived lack of professionalism and poor attendance. It was only after that email that *Newell* requested that the meeting also incorporate a discussion of additional accommodations she desired, and CMU

honored her request by discussing potential accommodations with her on March 28, 2017. Newell also argues that CMU offered her no alternative accommodations until the July 2017 formal letter, but this argument simply omits the fact that she was excused from receiving treatments during her Spring 2017 exams—an informal accommodation demonstrating that CMU took good-faith steps to work with her while it formally investigated her internal complaint.

Accordingly, we affirm the district court's grant of summary judgment in favor of CMU on this claim.[5]

B.

Newell also asserts that she was subject to a hostile educational environment because CMU subjected her to severe, pervasive, and objectively offensive unwelcome harassment based on her disability. The district court observed that "[t]here does not appear to be a claim of 'hostile education environment' recognized by the Sixth Circuit" under the ADA or Rehabilitation Act. However, it analyzed Newell's claim under the analogous Title IX framework for claims of hostile educational environment based on sex and concluded that even if such a claim existed, summary judgment in favor of CMU was warranted. The parties do not dispute this legal framework on appeal. In the absence of a dispute over the issue between the parties and briefing fleshing out any differences, we leave consideration of the framework's acceptability for another day.

Assuming for purposes of argument that a claim for creating a hostile educational environment exists under the ADA or Rehabilitation Act, it would be plaintiff's burden to establish that she experienced severe and pervasive harassment on the basis of her disability. *Cf. Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (Title VII); *Doe*, 103 F.3d at 515

---

[5]Because we conclude that the district court properly granted CMU's motion for summary judgment, we need not consider its alternative argument that plaintiff failed to prove intentional discrimination as required to recover monetary damages.

("[T]he elements to state a supervisory hostile environment claim under Title VII equally apply under Title IX."). In other words, Newell must establish that her "educational experience was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of [her]' educational environment." *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) (first alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The parties agree that Newell would have to satisfy both a subjective and objective component: "(a) the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive; and (b) [p]laintiff must subjectively regard the environment as abusive." *Klemenic v. Ohio St. Univ.*, 10 F. Supp. 2d 911, 916 (S.D. Ohio 1998) (citing *Harris*, 510 U.S. at 21–22). When evaluating hostile environment claims in other settings, we consider the frequency of the discriminatory conduct, its severity, whether the conduct contained a physical threat or humiliation, the degree to which the conduct affected the plaintiff's performance, and whether the plaintiff suffered psychological harm as a result of the conduct. *Id.*

The district court concluded that no reasonable juror could find that Newell subjectively regarded her educational environment as abusive:

> Plaintiff does not allege that her scholastic performance dropped as a result of her requests for accommodation or the alleged acts of retaliation by CMU staff. Rather, Plaintiff maintained a 3.67 GPA. Plaintiff contends that she is currently on medical leave, but this medical leave is taking place after a full semester in which her requested accommodations were granted. Plaintiff claims that she intends to return to CMU once she is physically able to do so. Plaintiff does not provide evidence that she was humiliated, received discrimination based physical threats, or that she required psychological therapy due to her experience at CMU. Without providing evidence that aligns with the factors set by the Supreme Court, Plaintiff is unable to establish the subjective component of the abusive educational environment test.

(Record citations omitted). Plaintiff's arguments on appeal do not persuade us that the district court erred. First, she says that the district court wrongly required her to establish each of the

factors enumerated in *Klemenic*. That is incorrect. The district court recognized that "no single factor is dispositive," and instead concluded that Newell had not provided evidence of *any* of the factors. Second, plaintiff notes that she has "paid in full for her program," so she has "no choice but to return" after her medical leave. But it is not clear to us how her payments to the university tend to prove or disprove that she was subject to a hostile educational environment during the time covered by the complaint (though they may explain why she is returning).

Third, Newell says she presented evidence that her "psychological well-being suffered because of the discrimination she was facing" because she was diagnosed with anxiety and irritable bowel syndrome following the Spring 2017 semester. But again, Newell makes this claim without any citation to the record. She also did not cite her diagnoses below as evidence of harassment in response to CMU's motion for summary judgment. Thus, plaintiff is attempting to build a better case on appeal than she presented to the district court. We typically do not review forfeited arguments like plaintiff's, *see Thomas M. Cooley Law Sch.*, 759 F.3d at 528 ("It is well-settled that this court's function is to review the case presented to the district court, rather than a better case fashioned after an unfavorable order.") (citation omitted)), and we see no reason to excuse the forfeiture here, *see Swanigan v. FCA US LLC*, 938 F.3d 779, 788–89 (6th Cir. 2019).

Fourth, Newell argues that the district court erred by finding that CMU had not engaged in any threatening behavior because "the discriminatory conduct committed by . . . CMU (i.e., denying Plaintiff-Appellant her reasonable accommodations) was entirely physically threatening to Plaintiff-Appellant's safety as she was continuously injured" because of the lack of accommodations. Again, this is an argument presented for the first time on appeal, so it is forfeited. *Swanigan*, 938 F.3d at 788–89.

Finally, Newell argues that she suffered a "complete breakdown" during the March 28 meeting with Silkwood-Sherer, citing portions of the transcript of that meeting. This argument too was raised for the first time on appeal, and we decline to address it for the same reasons noted above.

Accordingly, we affirm the district court's grant of summary judgment in CMU's favor on Newell's hostile-educational-environment claim.

## IV.

For these reasons, we affirm the judgment of the district court.